# JOHN NORMAN HUFFINGTON v. STATE OF MARYLAND

[No. 136, September Term, 1981 and
No. 10, September Term, 1982.]

*Decided December 6, 1982.*

2

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Louis P. Willemin, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* on the brief, for appellant.

*Patricia E. McDonald, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Deborah K. Handel, Assistant Attorney General,* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and RODOWSKY, JJ., dissent. RODOWSKY, J., filed a dissenting opinion at page 17 *infra,* in which MURPHY, C. J., and SMITH, J., join.

On 13 November 1981, in the Circuit Court for Caroline County, a jury convicted the appellant, John Norman Huffington, of two felony murders, robbery, burglary, and violations of the handgun laws. After the jury determined

that the appropriate sentence for each of the felony murders was death, the trial court imposed the death penalty. In addition, the trial court imposed consecutive terms of imprisonment for the robbery, burglary, and handgun violations. This appeal followed.

On appeal, the appellant claims that the trial court committed numerous prejudicial errors in the course of the pretrial proceedings, the trial proceedings, and the sentencing proceedings. More particularly, he points out that certain testimonial evidence was presented by the State after the prosecution and the defense each had concluded its case in chief and had rested. The appellant contends that such evidence was not properly admitted, either as rebuttal evidence or as an exercise of the trial court's discretion to vary the order of proof and admit evidence at the rebuttal stage that should have been adduced during the prosecution's case in chief. Because we find that the testimony in question was not rebuttal evidence, that the trial court was not, in fact, exercising its discretion to admit nonrebuttal evidence at the rebuttal stage of the trial, and that the trial court committed prejudicial error by admitting the evidence, we shall reverse the convictions and remand the case for a new trial. Under these circumstances, no other questions need be considered.

At the trial, both direct and circumstantial evidence was produced during the prosecution's case in chief that was intended to show that on 25 May 1981 the appellant killed Diane Becker and Joseph Hudson, both of whom had lived together in a trailer located in the Long Bar Harbor campground in Harford County. The direct evidence was adduced by an alleged accomplice, Deno Kanaras, who, at the request of the State, was called by the trial court as a witness. According to the agreed statement of facts, the substance of Kanaras's testimony concerning the events of the evening of 24 May and the morning of 25 May 1981 was as follows:

"Appellant spoke with Hudson at the Golden Forty and arranged to make a cocaine purchase after the

bar closed. On leaving the club, they followed Hudson and company to the camp ground, stopping at the 7-11 on the way. At the trailer, Appellant spoke with Hudson about purchasing 3½ grams of cocaine, and about arranging a subsequent deal for the remainder of Hudson's cocaine. Appellant purchased the 3½ grams for $275, toward which Kanaras contributed $100. Appellant agreed to try to arrange a deal for the remainder of Hudson's cocaine, approximately another 3½ grams, at a price of $350. Kanaras and Appellant then left the trailer and went to Appellant's apartment, arriving at about 3:30 a.m. At the apartment, Kanaras sat in the living room while Appellant went to the bedroom to make some telephone calls. Appellant subsequently returned and indicated that he had arranged a purchase. They returned to the campground where Appellant told Hudson he had a purchaser and also wanted to discuss a bigger deal later that evening. Hudson then got dressed and left a note on a counter in the trailer whereupon the three men left in Kanaras's car. Appellant gave directions to Wheel Road and instructed Kanaras to park the car in the driveway of an old farm. All three men got out of the car and walked up the driveway, Kanaras and Hudson walking side by side, Appellant following. Suddenly, Kanaras heard four or five gunshots and Hudson fell. Appellant reloaded the revolver, approached Hudson, and fired twice from close range into the left side of the head. Kanaras was so shocked he didn't know what to say. Appellant then rolled Hudson's body over and pulled a bag of cocaine out of his shirt pocket. Ultimately, Appellant placed this bag of cocaine into a Marlboro cigarette box. Appellant removed the bag from Hudson's pocket, turned to Kanaras, pointed the gun at him, and ordered him to drive them back to the campground. Appellant said that Hudson had $2000 at the campground, which he

wanted. At the entrance to the campground, Appellant directed Kanaras to park the car some distance from Hudson's trailer so it would not be seen and to leave the car unlocked with the keys in the ignition. Appellant also directed Kanaras to accompany him to the trailer. Appellant opened the door, which was unlocked, and they went in. Becker's son was asleep in the back of the trailer at the time. After Appellant picked up the note Hudson had left and put it in his pocket, they searched the trailer, and Kanaras found the money in a cabinet. Appellant then drew a knife out of his boot and told Kanaras to kill Diane Becker. Kanaras, shocked, said he could not kill her. Appellant then walked over toward the bed, picked up a bottle from the floor, and struck Becker five or six times in the back of the head. Appellant then took the knife and stabbed Becker repeatedly in the chest, back and throat. When Appellant finished stabbing Becker in the throat, Kanaras regained his senses and left the trailer. Appellant was fifteen or twenty feet behind. They ran to the car, Appellant carrying the bottle and a pocketbook. They then drove to Appellant's apartment.

"At the apartment, Appellant changed clothes, and cleaned the gun, knife, and bottle with some rags. He counted the money and forced Kanaras to take $840, although Kanaras tried to refuse it. Appellant put his pants in the sink and poured bleach on them in an effort to clean out the bloodstains. Later, he put the pants into a bag and put the knife, bottle, and pocketbook into another bag. They then left the apartment, Appellant having ordered Kanaras to take him to the Fiddler's Convention. En route, they stopped by a creek at Harmony Church Road where Appellant threw the bottle into some brush, burned the pocketbook and note, and threw some live rounds of ammunition into the creek. They drove further to a location in

6

Cecil County where Appellant dropped the knife and gun into some stagnant water. Still terrified, being unsure whether Appellant possessed any further weapons, Kanaras drove Appellant to the Fiddler's Convention as directed. They walked around the Convention and Kanaras spoke with someone he knew. They left after an hour. Kanaras drove Appellant to Hall's Furniture Store in Aberdeen, where a friend of Appellant's would be working. At that time, Appellant threw the bag with the pants into a nearby dumpster. Appellant then went into the furniture store. Kanaras drove home."

Much circumstantial evidence was also adduced by the State as a part of its case in chief. Neighbors who had been with Hudson and Becker at the Golden Forty Club on the evening of 24 May, and were with them when they left, saw a blue 1980 Monte Carlo, a type of car frequently driven by Kanaras, follow Hudson and Becker to their trailer. The car was then occupied by two men, one of whom Becker referred to as Deno. As the babysitter caring for Becker's child was leaving the trailer shared by Becker and Hudson, she saw two men emerge from such a car and walk to the porch of the trailer.

Additionally, police officers, accompanied by Kanaras, found a knife and sheath, a gun, and a holster in a pool of water located in Cecil County. According to an expert, the expended bullets in Hudson's body could have been fired from that gun, and the bent shell casings found near Hudson's body were fired by that gun. The police officers, accompanied by Kanaras, also found six live rounds of .38 caliber ammunition, the remains of a burnt handbag, and a Smirnoff's bottle at Harmony Church Road. According to an expert, some of the bullets recovered from Hudson's body, as well as bullets recovered from the creek at Harmony Church Road, contained similar chemical compositions. In addition, according to experts, the recovered vodka bottle had human bloodstains on it that could have come from Becker, and a

latent fingerprint that matched a fingerprint taken from the appellant's right index finger. Moreover, the police officers, accompanied by Kanaras, found a brown paper bag containing corduroy pants that were damp and smelled of bleach in a dumpster near Hall's Furniture Store. At the appellant's apartment, the police officers found a Marlboro box containing a white powder subsequently determined to be cocaine. According to experts, hair samples taken from the appellant microscopically matched hair found in Becker's garter belt and a blanket from her bed. The appellant's right boot contained a spot of blood, although there was not enough to tell if it was of human or animal origin, while Kanaras's left boot contained human blood.

Finally, there was evidence to show that at or about 12:30 a.m. on 26 May 1981, the appellant gave the police a statement, found by the trial court to be voluntary. In that statement, the appellant said that at or about 1:00 a.m. on 25 May, the appellant and Deno Kanaras had arrived at the Golden Forty Club where they remained until the club closed. The appellant stated that they then went to a weekend Fiddler's Convention in Cecil County where they remained until about 11:00 a.m. on 25 May. At that time, the appellant specifically denied having gone to Hudson's trailer in the Long Bar Harbor campground. Subsequently, however, the appellant admitted having been at Hudson's trailer with Kanaras after the Golden Forty Club closed. He stated that they went there to "talk about drugs" before going to the Fiddler's Convention. He indicated that after the purchase of some marijuana they left. The appellant explained the inconsistency in his statement as having resulted from his fear of becoming a suspect in the case.

After adducing all of this direct and circumstantial evidence, the State rested its case. The defense then made a motion for a judgment of acquittal that was denied.

After being advised of his rights, the appellant elected to testify in his own defense. According to the agreed statement of facts:

"[Huffington] admitted that he was present with

Kanaras at the Hudson trailer after the Golden Forty Club had closed, but said he was only there accompanying Kanaras. Kanaras had arranged with Hudson to make a deal for some cocaine. Appellant was only an observer, present because Kanaras was giving him a ride home. While there, Appellant did discuss some potential future cocaine transactions with Hudson. Appellant indicated that Hudson had occasionally sold cocaine for him. Appellant and Kanaras left Hudson's trailer at about 3:00 a.m. Kanaras drove him home, where he stayed for the remainder of the night. Kanaras left. Between 3:00 and 3:30, Appellant's friend Tom Hall called to invite him to an all night party, which invitation he declined. The next morning at about 9:00 a.m., Kanaras knocked on the door of Appellant's apartment and woke him up. They went to the Fiddler's Convention, arriving at about 10:00 or 10:30 a.m. They only stayed for an hour, as Kanaras became ill. Then, Kanaras drove him to Tom Hall's house, and then to Hall's Furniture Store so that Appellant could borrow Tom Hall's car. Appellant then purchased a money order (with money he acquired dealing cocaine) to pay his rent. Thereafter, he drove to Pimlico where he spent the afternoon. After leaving Pimlico, he went home. About 6:00 p.m., Kanaras called Appellant, indicated that he (Kanaras) was in trouble, and asked Appellant to tell the police that they had been together all night at the Fiddler's Convention. Appellant agreed. Appellant testified that at about 10:00 p.m., he went to the Fox's Den restaurant where he met Tommy Kanaras, a relative of Deno's. Tommy told Appellant that the police wanted to speak with him. Appellant then went to the Sheriff's office, where he spoke with Van Horn. Appellant attempted to provide Kanaras an alibi, as he had promised. Appellant denied any involvement in the murders of Hudson or Becker and said

that he believed the blood on his boots came from his puppy, which had cut its foot. He also noted that his fingerprint must have gotten on the vodka bottle during one of his visits to the trailer (he had been there probably a couple of dozen times, maybe once or twice in the month preceding the offense). When confronted with the pistol recovered in Cecil County, Appellant denied having ever seen, owned, or possessed it.

"On cross-examination, Appellant admitted that subsequent to his arrest, at about noon on May 26, he was presented with a statement of charges against him. He recognized that the statement of charges indicated that Kanaras had admitted complicity in the murders with Appellant and therefore no longer needed an alibi. Nevertheless, Appellant had not previously amended his statement to the police because he had given Kanaras his word he would provide him an alibi.

"Appellant also admitted on cross-examination that he had not gone to the Fox's Den restaurant at 10:00 p.m. on May 25, as he had testified on direct. In truth, he had been at his girlfriend Kim Bognanni's house at the time, and attributed his previous testimony to a desire to keep her from being involved in the proceedings. He stayed at her apartment for about an hour. Appellant was not questioned concerning any conversations he may have had with Bognanni at that time."

Tom Hall then testified for the defense. He said that he had called the appellant on 25 May between about 2:30 and 3:00 a.m. to invite him to a party. The appellant declined, saying that he was tired and wanted to go to sleep. Hall also claimed to have been present on the evening of 25 May when the appellant's puppy cut its foot.

The only other evidence presented by the defense consisted of the testimony of numerous witnesses who

expressed their favorable opinion regarding the appellant's honesty and peacefulness. The defense then rested its case.

After the defense rested, the State did not move to reopen its case. Rather, in response to an inquiry from the trial court as to the number of rebuttal witnesses the State intended to call, the State indicated that it intended to call four rebuttal witnesses. After completion of the testimony of the first three witnesses, the State again did not move to reopen its case. Instead, it called Kim Bognanni, a female friend of the appellant's, to testify. Moreover, the trial court did not at any time on its own motion invoke its discretion to vary the order of proof.

On direct examination, Bognanni testified, among other things, that on 25 May 1981 at about 7:30 p.m., the appellant arrived at her apartment. During her direct testimony, the following colloquy took place:

"Q [Mr. Cassilly, the State's Attorney]. Okay, a — once he came inside, can you tell us what went on and what happened?

"A [Bognanni]. I had just gotten home — I was running around and doing a lot of things, and we were just sitting around the table talking and partying.

"Q. And can you tell me what John was talking about at the time?

"A. He was mentioning taking a trip.

"Q. Did he say where he wanted to take a trip too?

"MR. TARRANT [Defense Counsel]: Objection, Your Honor, I wonder if we could approach the bench?

"THE COURT: Yes sir, come forward.

*AT THE BENCH:*

"MR. TARRANT: If, The Court please, I object to the testimony, because I don't think The State laid any foundation for this and asked the Defendant when he was on the stand and said whether he was

taking a trip on May 25th. Now this is rebuttal — it is to contradict something that is brought out during our case, and I don't believe that the foundation has been laid for it.

"MR. CASSILLY: Well, Your Honor, first of all the Defendant testified that he didn't even go to her apartment. A — later on he changed his testimony and said yes that he did go to her apartment, and that he was trying to cover up and keep her from being implicated, and then he went on to tell us how he met Tommy Kanaras there, and a — just generally what had happened that evening. I think this is proper rebuttal to go over and just pick and choose exactly her testimony — only that which deals with specific exact points, and then a —

"MR. TARRANT: But if The Court please, obviously they are trying to show flight or flee — that he was trying to flee from something, and I think he should be asked whether he contemplated flight or contemplated taking a trip, and then he said, 'No,' and if she comes up and testifies that a — but he wasn't asked that, so there is no foundation for it.

"THE COURT: Overruled. I don't believe the fact that he was talking about taking a trip meant that he was about to flee. If I talk about taking a trip with you all, I am not about to flee, and maybe he wasn't either. Therefore we will overrule your objection, and it is in our discretion and the judge thinks it is proper.

"Objection overruled."

Subsequently, over continuing objection, Bognanni testified that the appellant had stated that he was thinking of taking a trip to Disneyworld in Florida; that they called a couple of airlines to find out about flights and prices of such a trip; that the appellant had never previously spoken to her about taking a trip to Florida; and that when the appellant

asked her to go to Florida, her reaction was, "Well, I wasn't about to pick up and go. You know, to go — I wasn't just going to stop everything and just go." On cross-examination, she testified that before the evening of 25 May 1981, she had suggested on several occasions that she and the appellant should go on a trip, but had never suggested that the trip be to Florida. She indicated that while the idea of a trip was not new on 25 May, she "had no idea that [on that day] he was going to come out and say 'Let's go!' "

At the conclusion of Bognanni's testimony, the trial court asked the State whether it had any other rebuttal witnesses. The State indicated that it did not and, thereafter, the trial court asked the defense whether it had any rebuttal witnesses. The defense indicated that it did not.

Subsequently, the defense made a motion for a judgment of acquittal that was denied. The trial court instructed the jury. Closing arguments were then presented.

During closing arguments, the State made specific references to Bognanni's testimony concerning the trip to Florida. More particularly, the State said:

"If Huffington is only truly an alibi witness, as he would have you and I believe, just an alibi witness for Kanaras, then why is Huffington getting information from the airlines, ticket prices, and checking on flights to Disneyworld when he was over at Kim Bognanni's on the 25th, the same evening after the murders.

"According to Kim Bognanni, Huffington never mentioned a trip before that date to Florida."

In response to this portion of the State's closing argument, defense counsel, in closing argument, said:

"I just want to comment on two things that were raised by the prosecution. First of all, a — the call about a trip to Disneyworld. Well, as Miss Bognanni said . . . she had been wanting to get away for some time, and John made some — made some phone calls, and I don't think that by itself that a —

that that proves a thing. I am constantly telling my wife I would like to go away somewhere, and we are always reading things, but we very seldom seem to go."

Finally, in rebuttal, the State's attorney, in closing argument, said:

"You will recall that the defense attorney said, 'Well, it is not unusual for myself,' meaning himself, Mr. Tarrant, ' —talking to say his own wife about vacation, so therefore that it certainly wouldn't be unusual for Mr. Huffington to discuss going on vacation with Miss Bognanni. ' The problem is that Miss Bognanni says that Huffington never discussed with her before about going to Florida, but he just happened to be discussing that with her the evening after the murders took place!"

After closing arguments were concluded, the jury retired to deliberate and ultimately rendered its guilty verdicts.

This case presents the question whether certain testimonial evidence presented by the State after the prosecution and the defense each had concluded its case in chief and had rested was properly admitted either as rebuttal evidence or as an exercise of the trial court's discretion to vary the order of proof and admit evidence at the rebuttal stage that should have been adduced during the prosecution's case in chief. This Court has in the past considered virtually identical questions. *Mays v. State,* 283 Md. 548, 552-53, 391 A.2d 429, 431 (1978); *State v. Hepple,* 279 Md. 265, 270-72, 368 A.2d 445, 448-49 (1977). In *Hepple,* a case strikingly similar to the instant case, we said:

"It should be made clear from the outset that there are two distinct types of evidence which may be adduced at this point in the proceedings: (1) rebuttal evidence, which the State ordinarily has a right to have received, and (2) evidence which should have been adduced during the State's case in chief, but which the trial court, in the exercise of its

discretion to vary the order of proof, may allow at the rebuttal stage. Rebuttal evidence 'includes any competent evidence which explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense.' Our cases are clear that the question of what constitutes rebuttal testimony rests within the sound discretion of the trial court, and that the court's ruling should be reversed only where shown to be both 'manifestly wrong and substantially injurious.' Even if the trial court clearly rules that certain testimony is not rebuttal evidence, the court may nonetheless exercise its discretion to vary the order of proof and admit it as part of the case in chief at the rebuttal stage in order to meet the requirements of a particular case, so long as this action does not impair the ability of the defendant to answer and otherwise receive a fair trial. Such deviations from the general rule regarding the order of presentation of evidence are likewise in the sound discretion of the trial court. This distinction was made clear by Chief Judge Orth . . . in his opinion for the Court of Special Appeals, 31 Md.App. at 534, 358 A.2d at 290:

'The two discretions enjoyed by the trial court, the one to permit the moving party to reopen its case to introduce evidence adducible in chief, and the other, to determine whether evidence offered to rebut is truly rebuttal evidence, are separate and distinct. As to both, of course, the evidence must be competent, relevant and material. With respect to reopening the case, the judge must consider whether the State deliberately withheld the evidence proffered in order to have it presented at such time as to obtain an unfair advantage by its impact on the trier of facts. To this end the judge must see whether the proposed evidence is merely cumulative to, or corroborative

of, that already offered in chief or whether it is important or essential to a conviction. With respect to rebuttal evidence, the judge must consider whether the evidence explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the accused. Thus, the considerations involved in the exercise of the two discretions are materially different. The sound exercise of discretion to allow the State to reopen its case provides no basis for finding that evidence meets the definition of rebuttal evidence, and *vice versa.*' " *Hepple,* 279 Md. at 270-72, 368 A.2d at 448-49 (citations omitted) (footnote omitted).

Applying these principles to the instant case produces a clear result. The record here conclusively demonstrates that the trial court was not exercising its discretion to vary the order of proof when it determined that Bognanni's testimony concerning a trip to Florida was admissible. The record further shows that in his case in chief the appellant did not adduce any evidence concerning a Florida trip. Thus, Bognanni's testimony concerning such a trip neither explained, replied to, nor contradicted any new matter brought into the case by the defense. Accordingly, Bognanni's testimony did not constitute rebuttal evidence that the State was entitled to have admitted. The trial court erred in admitting this testimony as rebuttal evidence.

The only remaining question is whether the error committed here constituted reversible error. The record shows that the State adduced direct and circumstantial evidence that, if believed, was sufficient to support a finding of the appellant's guilt. The central core of the appellant's defense was his own testimony adduced to raise a reasonable doubt in the minds of the jury. In essence, in this case, at the moment of truth the jury's verdict depended upon whether it believed that the direct and circumstantial evidence was sufficiently compelling to establish the appellant's guilt beyond a reasonable doubt.

In Maryland, flight from justice has always been deemed indicative of a consciousness of guilt and, thus, of guilt itself. *Jones v. State,* 242 Md. 323, 327, 219 A.2d 77, 79 (1966); *Davis v. State,* 237 Md. 97, 105, 205 A.2d 254, 259 (1964), *cert. denied,* 382 U.S. 945, 86 S.Ct. 402 (1965); *Clay v. State,* 211 Md. 577, 584-85, 128 A.2d 634, 638 (1957). Bognanni's testimony that on the evening after the killings the appellant was planning a trip to Florida supported an inference that the appellant was attempting to flee from the scene of the crimes and, therefore, supported an inference of the appellant's guilt. This inference of guilt based on flight was utilized in argument to the jury.

The evidence of guilt based on flight was not merely cumulative. It was different in character from all of the other direct and circumstantial evidence of guilt adduced by the State. It introduced an additional, different, and independent fact or circumstance upon which the jury could premise a finding of guilt. It is because of the disparate character of the erroneously admitted evidence that we cannot conclude that its prejudicial effect was so insignificant in comparison to the direct and circumstantial evidence of guilt that it did not contribute to the rendition of the guilty verdicts.

Under the circumstances here, we cannot, upon reviewing the record, declare a belief beyond a reasonable doubt that the error in no way influenced the verdicts. *Sherman v. State,* 288 Md. 636, 640-41, 421 A.2d 80, 82 (1980); *Hillard v. State,* 286 Md. 145, 155, 406 A.2d 415, 421 (1979); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976); *see Johnson v. State,* 292 Md. 405, 430, 439 A.2d 542, 556 (1982). The error cannot be deemed harmless. Accordingly, we shall reverse and remand the case for a new trial.

> *Judgments reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by Harford County.*

*Rodowsky, J., dissenting:*

I respectfully dissent. The examination by the State of Kim Bognanni (Bognanni) elicited proper rebuttal testimony, in my opinion.

This was a case of substantial factual conflict between the State's principal witness, Deno Kanaras (Deno), and the Appellant, John Norman Huffington (Huffington). Portions of Huffington's testimony were corroborated by his witness, Tom Hall (Hall). The testimony which the majority holds to have been erroneously admitted deals with a time discrepancy between State and defense proof, involving the period from 7:30 p.m. to 10:00 p.m. on Monday, May 25, 1981. Defense evidence from Huffington and Hall placed Huffington at Huffington's apartment during this period, as part of an exculpatory explanation for a bloodstain found by the police on Huffington's boot. In contradiction of this new matter from the defense, Bognanni swore that Huffington was at Bognanni's apartment during the same period. Bognanni's description of what she and Huffington were doing during the two and one-half hour discrepancy tended to show that Bognanni's version was the more credible. Her testimony was not admitted as evidence of contemplated flight.

Under the State's proof, through Deno, the murders were committed by Huffington between 4:00 a.m. and daylight on May 25. According to Deno, he was continuously in Huffington's company from about midnight on the 24th-25th until at least noon on the 25th, and he had witnessed the murders. Deno also testified that at about 6:00 p.m. on the 25th he received a call from Huffington in which Huffington said they both should state they had been at the Fiddler's Convention. Part of the State's proof was a bloodstain found on a boot owned by Huffington. The State's expert could not identify whether it was blood from a human being or from an animal.

Huffington's version was that he knew nothing about the murders, but that he had been asked by Deno to alibi for

Deno by giving the Fiddler's Convention story. Huffington testified that he had been with Deno until 3:00 a.m. on the 25th when Deno dropped Huffington off at Huffington's apartment. Huffington then walked his dog and, on returning to his apartment, received a telephone call from Hall. After the call Huffington went to bed and slept until about 9:00 a.m. During most of the afternoon of the 25th Huffington was at Pimlico race track. He said he was back in his apartment by 6:00 p.m. when Deno telephoned him. Deno wanted Huffington to alibi for Deno, but Deno did not explain why. Huffington agreed. Huffington also said that blood probably got on his boot when he tended to his dog which had cut its hind leg in a fall from the porch at Huffington's apartment. This incident occurred when Hall and a Mark Gravely were visiting with Huffington.[1]

On his direct examination, Huffington said that he had gone to the Fox's Den at about 10:00 p.m. on the 25th where he met Tommy Kanaras (Tommy), a cousin of Deno's. Tommy said that the police wanted to talk to Huffington. Huffington went to the police station that evening and gave the police the false alibi as Deno had requested. Huffington volunteered for a lie detector test at a later date, which the police were to arrange. He also consented to a search of his apartment, after telling the police they would find paraphernalia which Huffington did not want, because he was no longer going to deal in cocaine.

On cross-examination Huffington admitted that he did not go from his home to the Fox's Den on the evening of the 25th. He went from his home to that of his female friend Bognanni, whom Huffington, on direct, had been trying to shield from involvement. Huffington said that he had been with Hall and Gravely, that Hall dropped Huffington off at Bognanni's apartment about 10:00 p.m., that Tommy arrived at Bognanni's about 11:00 p.m., and that Tommy then took Huffington into Bel Air where Huffington went to the police and gave the false alibi for Deno.

---

1. Mark Gravely did not testify at trial.

Under Huffington's version it was not until the 26th, after he was arrested based on Deno's statement to the police, that Huffington concluded Deno no longer needed an alibi.

Hall was a witness in the defendant's case. Hall testified that he telephoned Huffington's apartment about 2:30 a.m. or 3:00 a.m. on the 25th and spoke to Huffington to invite him over to Hall's for a party, but Huffington declined. Hall also said that on the evening of the 25th he left work in Aberdeen at about 7:00 p.m. with Huffington. They traveled in Hall's car which Huffington had used to go to Pimlico. They went directly to Huffington's apartment near Bel Air, where they were met by Mark Gravely. While the three were on the porch, Huffington's dog slipped off and cut one of its paws. Huffington comforted the dog. The three men were together at Huffington's until about 8:00 p.m. when Hall and Mark Gravely left Huffington at his apartment and went in Gravely's van to a pool hall in Bel Air. Gravely brought Hall back to Huffington's about 9:30 or 10:00 p.m., and Gravely went elsewhere. At 10:15 or 10:30 p.m. Hall, in Hall's car, drove Huffington to Bognanni's apartment, and dropped him off there.

When the State called Bognanni in rebuttal, her direct testimony developed that she and Huffington were "very close" friends. Her apartment was about two to three miles from where Huffington lived. On the 25th of May she had gotten home from work about 5:00 p.m. Someone dropped Huffington off at Bognanni's around 7:30 p.m. Her examination, the defense objection and the trial court's ruling then proceeded as quoted in the majority opinion.

It is plain from the quoted portion of the record that the trial court did not admit the disputed evidence on the theory that the State was showing flight, or had a right on rebuttal to show flight. What had been developed by the State, without objection, was that Bognanni put Huffington in her apartment two and one-half hours before Huffington said he had arrived there. This was the period when Huffington and Hall had testified Huffington was handling his cut dog. If the jury believed Bognanni, they would have reason to reject not only the Huffington-Hall explanation of the blood, but the

jury would also have had further reason to disbelieve Huffington's story that he was at home when the murders were committed and to disbelieve Hall's partial confirmation of Huffington's story by way of the telephone call. Thus, in argument on the objection, the State said it wanted to bring out "just generally what happened that evening," and that it should not be required to do so by picking and choosing "specific exact points . . . ." If Bognanni was able to fill in what transpired during the time she said she was with Huffington, her testimony would become more believable.

Against this background, the testimony objected to was clearly an integral part of the State's proper rebuttal of new matter. The Bognanni evidence showed that between 7:30 p.m. and 11:30 p.m., when Tommy picked Huffington up at Bognanni's, she and Huffington talked about a trip to Florida, made telephone calls for schedule and price information, and snorted cocaine. Indeed, the claimed erroneous ruling was merely a proper exercise of the trial court's discretion concerning the amount of time it would permit to be devoted on a particular line of relevant examination.

Nor did the State argue at the close of the case that Bognanni's evidence supported an inference of guilt based on flight. In the State's opening summation the reference to talk about going to Disney World was in response to Huffington's position that his only connection with the murders was to give a false alibi for Deno. The State suggested that it was inconsistent for Huffington to claim he was simply helping support Deno's original story, when Huffington was getting information on a trip to Florida. Some weight to this argument might be found in Huffington's offer to the police to take a lie detector test at some time after May 25.[2]

By holding that Bognanni's testimony was evidence of flight which was improper rebuttal, the majority has greatly expanded what may constitute proof of flight. It is said that

---

2. Even if one were to consider the State's reference to the Bognanni testimony as insinuating flight, and thereby going beyond the purpose for which the proof was admitted, there was no defense objection to that argument, no request for a curative instruction, and no motion for a mistrial.

"planning a trip to Florida [on the evening after the killings] supported an inference that the appellant was attempting to flee from the scene of the crimes and, therefore, supported an inference of the appellant's guilt." The uncontradicted proof was that Huffington and Bognanni had, for some considerable time previously, been talking about a vacation trip, but had not specifically discussed going to Disney World. Today's holding that that evidence tended to show guilt means it was admissible in the State's case in chief. It means such evidence is admissible in chief against any person accused of committing a crime at or about the time that person was getting information about a possible, and long contemplated, vacation. No previous Maryland decision has gone that far. Because the proof in the instant case was not admitted on the theory that the State was proving flight, I see no need to reach the question in this case.

Chief Judge Murphy and Judge Smith have authorized me to state that they join me in the views expressed herein.