569 A.2d 657

**STATE of Maryland**

v.

**Joseph W. EDISON.**

No. 72, Sept. Term, 1989.

Court of Appeals of Maryland.

Feb. 12, 1990.

542

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. both on brief), Baltimore, for petitioner.

John L. Kopolow, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., HOWARD S. CHASANOW * (Specially Assigned) and CHARLES E. ORTH, Jr., (retired, Specially Assigned), JJ.

CHARLES E. ORTH, Jr., Retired Specially Assigned Judge.

The Grand Jury for Baltimore City handed down four indictments alleging that Joseph Winslow Edison was the criminal agent in a variety of crimes. Prior to trial, Edison filed a motion for separate trials. The Circuit Court for Baltimore City denied the motion. Trial proceeded before a jury on all of the indictments and each of their counts. The charges and verdicts thereon were as follows.

| Indictment | Count | Date of Offense | Charge | Verdict |
|---|---|---|---|---|
| 1 | 1 | 16 July 1986 | Murder of Ernest L. Ellis | Guilty of murder in the first degree |
| | 2 | 16 July 1986 | Use of a handgun in a crime of violence | Guilty |
| | 3 | 16 July 1986 | Possession of a handgun | Guilty |
| 2 | 1 | 16 July 1986 | Conspiracy to murder Ellis | Guilty |
| 3 | 1 | 6 November 1986 | Attempted murder of Officer Darryl A. Kane | Not Guilty |
| | 2 | 6 November 1986 | Assault and battery of Kane | No Verdict |
| | 3 | 6 November 1986 | Possession of a handgun | Guilty |
| | 4 | 6 November 1986 | Use of a handgun in a crime of violence | Not Guilty |
| | 5 | 6 November 1986 | Possession of a handgun after having been convicted of a crime of violence | Motion for judgment of acquittal granted |
| 4 | 1 | 9 February 1987 | Escape | Guilty |

* Howard S. Chasanow, a judge of the Seventh Judicial Circuit, was specially assigned to the Court of Appeals at the time the case was argued. He was sworn in as a judge of the Court on 17 January 1990.

Sentences were imposed and Edison appealed. The Court of Special Appeals reversed the judgments. *Edison v. State*, No. 1142, September Term, 1988, filed 7 April 1989, unreported. We granted the State's petition for a writ of certiorari. The writ calls upon us to determine whether the Court of Special Appeals was correct in its conclusion that the trial court erred in its insistence that all of the indictments be jointly tried.

## I

The four indictments related to three incidents:

a) Indictments 1 and 2—the murder of Ellis on 16 July 1986;

b) Indictment 3—the attempted murder of Officer Kane on 6 November 1986;

c) Indictment 4—the escape from the Baltimore City Jail on 9 February 1987.

Edison believed that each incident should be tried separately—thus, indictments 1 and 2 at one trial, indictment 3 at another trial, and indictment 4 at a third trial. He did not ask for a severance of counts within an indictment. In the proceedings in the trial court—during the hearing on his pretrial motion for severance, throughout the guilt stage of the trial and in argument at his post-trial motion for a new trial—Edison continuously objected to the joinder. He stoutly maintained in his persistent requests for severance that the joinder of the indictments was so prejudicial as to deprive him of a fair and impartial trial. But his entreaties were unavailing.

## A

Potential prejudice is the overbearing concern of the law of this State with respect to joint or separate trials of a defendant charged with criminal offenses. To this end, we adopted Maryland Rule 4-253(c):

If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of

any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires.

And, in ruling on a motion for a joint trial when a defendant is charged in two or more charging documents, "the court may inquire into the ability of either party to proceed at a joint trial." Md. Rule 4–253(b).[1] We have observed that joinder may be prejudicial to a defendant in three important aspects:

First, he may be embarrassed, or confounded in presenting separate defenses.... Secondly, the jury may cumulate the evidence of the various crimes charged and find guilt when, if the offenses were considered separately, it would not do so. At the very least, the joinder of offenses may produce a latent hostility, which by itself may cause prejudice to the defendant's case. Thirdly, the jury may use the evidence of one of the crimes charged, or a connected group of them, to infer a criminal disposition on the part of the defendant from which he may also be found guilty of other crimes charged.

*McKnight v. State,* 280 Md. 604, 609, 375 A.2d 551 (1977).

 The matter of a severance or a joinder is ordinarily committed to the discretion of the trial judge. *Grandison v. State,* 305 Md. 685, 705, 506 A.2d 580, *cert. denied* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174, *reh. denied,* 479 U.S. 1001, 107 S.Ct. 611, 93 L.Ed.2d 609 (1986); *Graves v. State,* 298 Md. 542, 544, 471 A.2d 701 (1984). The exercise of that discretion usually brings into play what is commonly known as the "other crimes" rule. "Generally, 'evidence of a defendant's prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial.' " *State v. Faulkner,* 314 Md. 630, 633, 552 A.2d 896

---

**1.** Joinder and severance of criminal trials was formerly governed by Md. Rule 745, and, prior to the adoption of that rule, by Md. Rules 734 and 735. The present Rule 4–253 is identical to its immediate precursor, Rule 745, which was virtually identical, in pertinent part, to its precursors, Md. Rules 734 and 735. Opinions of this Court citing to Rules 745 or 734 or 735 are appropriate for Rule 4–253.

(1989), quoting *Straughn v. State,* 297 Md. 329, 333, 465 A.2d 1166 (1983). We observed in *Cross v. State,* 282 Md. 468, 473, 386 A.2d 757 (1978):

> A mere cursory review of the case law ... readily reveals that there are few principles of American jurisprudence more universally accepted than the rule that evidence which tends to show that the accused committed another crime independent of that for which he is on trial, even one of the same type, is inadmissible. The law of this State is fully in accord.

There are numerous exceptions, however, to the general rule that a defendant's other acts or conduct must be suppressed. "Evidence of this type may be admitted if it tends to establish motive, intent, absence of mistake, a common scheme or plan, identity, opportunity, preparation, knowledge ... or accident," *Faulkner,* 314 Md. at 634, 552 A.2d 896, citing to *Ross v. State,* 276 Md. 664, 669–670, 350 A.2d 680 (1976), *see Cross,* 282 Md. at 473–474, 386 A.2d 757. But exceptions to the general rule are not limited to those noted in *Ross;* the *Ross* exceptions are not exclusive. For example, prior criminal conduct, with strict limitations, may be admitted to show "sexual propensity," *Vogel v. State,* 315 Md. 458, 464–466, 554 A.2d 1231 (1989), and to show consciousness of guilt, *Bedford v. State,* 317 Md. 659, 664–65, 566 A.2d 111 (1989). The admission of other crimes evidence "should be subjected to rigid scrutiny by the courts...." *Ross,* 276 Md. at 671, 350 A.2d 680. "The evidence proffered to the trial judge must be clear and convincing in establishing the accused's involvement in the other crimes." *Faulkner,* 314 Md. at 634, 552 A.2d 896, citing to *Cross,* 282 Md. at 478, 386 A.2d 757. Judge Adkins, speaking for the Court in *Faulkner,* outlined a three-step procedure to be followed when a trial court is faced with the need to decide whether to admit evidence of another crime—that is, evidence that relates to an offense separate from that for which the defendant is presently on trial. "[I]t first determines whether the evidence fits within one or more of the ... exceptions. That is a legal determi-

nation and does not involve the exercise of discretion." 314
Md. at 634, 552 A.2d 896. "If one or more of the exceptions
applies, the next step is to decide whether the accused's
involvement in the other crimes is established by clear and
convincing evidence.... We will review this decision to
determine whether the evidence was sufficient to support
the trial judge's finding." *Id.* at 634–635, 552 A.2d 896.
"If this requirement is met, the trial court proceeds to the
final step. The necessity for and probative value of the
'other crimes' evidence is to be carefully weighed against
any undue prejudice likely to result from its admission....
This segment of the analysis implicates the exercise of the
trial court's discretion." *Id.* at 635, 552 A.2d 896 (citations
omitted).

Even though the evidence may fall within one or
more of the exceptions of the "other crimes" rule, the trial
judge still possesses discretion as to whether it should be
received. *Id.* at 640, 552 A.2d 896.

> Thus "other crimes" evidence, even though indepen-
> dently and substantially relevant to some contested issue,
> may be excluded if its probative value is exceeded by
> potential jury hostility or unfair prejudice.

*Id.* at 641, 552 A.2d 896. "The leeway of this discretion lies
in the direction of excluding otherwise admissible evidence."
*Id.* A clearly incorrect decision to admit other crimes
evidence is an abuse of discretion. *Id.* In the exercise of
its discretion, the court is guided by the mutuality of
evidence principle. If, in separate trials, evidence as to
each individual offense would be mutually admissible, the
offenses may be joined. *McKnight*, 280 Md. at 612, 375
A.2d 551.

## B

As we have seen, evidence of other criminal conduct
which tends to show consciousness of guilt provides an
exception to the "other crimes" rule. It is well settled that
"evidence of flight from justice is admissible to show
awareness of guilt...." *Hunt v. State*, 312 Md. 494, 508,

540 A.2d 1125 (1988). Judge Cole, speaking for the Court in *Bedford, supra* [317 Md.], at 664, 566 A.2d 111, observed that we had concluded in *Sorrell v. State,* 315 Md. 224, 227, 554 A.2d 352 (1989), that, in Maryland, "[e]vidence of flight following a crime has generally been held admissible to show consciousness of guilt. . . . " *See also Pettie v. State,* 316 Md. 509, 519, 560 A.2d 577 (1989); *Hunt* [312 Md.] at 508–509, 540 A.2d 1125; *Huffington v. State,* 295 Md. 1, 15, 452 A.2d 1211, *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986); *Tichnell v. State,* 287 Md. 695, 716–717 n. 11, 415 A.2d 830 (1980). In *Davis v. State,* 237 Md. 97, 205 A.2d 254, *cert. denied,* 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965), we observed that

> the lapse of time between the crime and the . . . flight goes only to the weight to be accorded this circumstance, not to the admissibility of the [flight] as some evidence of consciousness of guilt.

*Id.* at 105, 205 A.2d 254. Nor does "[a]ny evidence contradicting the inference of guilt derived from flight . . . 'render the evidence of flight inadmissible, but is merely to be considered by the jury in weighing the effect of such flight.' " *Bedford* [317 Md.] at 665, 566 A.2d 111 quoting *Sorrell,* 315 Md. at 228, 554 A.2d 352 (quoting 1 Wharton's Criminal Evidence § 215 at 450).

> "Flight" includes an escape or attempted escape from confinement. C. McCormick, McCormick on Evidence § 271 (3d ed. 1984); *see* 2 J. Wigmore, Evidence § 276 (J. Chadbourn rev. 1979).

*Bedford* at 664, 566 A.2d 352.

## II

The pretrial motion filed by Edison alleged that he was "charged with the commission of two or more unrelated crimes, the joint trial of which would prejudice [his] right to a fair and impartial trial as to each charge." He prayed that the court "sever the trial of these indictments." We first look at what was before the court at the time the motion was denied. Defense counsel argued at the hearing

that "there is no relationship as to time or witnesses or ... the manner of the crimes being committed. There is just no relationship that would allow someone to hear an escape charge, which, obviously, is a very difficult charge to defend against when hearing a murder trial, where credibility is going to be the issue...." He requested that the indictments be severed "but in any event sever the escape charge...."

The prosecutor proposed a joint trial of all four indictments. The factual background leading to the indictments, he asserted, showed the propriety of his proposal. We give a precis of his factual representations. Edison was a suspect in the murder of Ellis. Warrants for his arrest were issued and the authorities were looking for him. Kane, a uniformed police officer, saw Edison (they were not strangers to each other) and Edison, realizing that the officer had "spotted" him, fled, pursued by the officer. Kane, "in good professional manner [did not] draw his service revolver at that time, but started to give chase on foot." During the flight Edison "turned and tried to fire what appeared like a gun. Nothing happened. There was no report, no explosion." Edison turned and "continued flight looking like he was putting his gun back down in to his dip [the front of his pants]." Edison was finally run to earth. A gun was recovered from his person. It had "slipped down into [his] trousers...." There was "a live round under the hammer with the indentation of the hammer and firing pin on the cartridge casing or primer." The prosecutor asserted that "this was a flight and that is always admissible as potential consciousness of guilt...." He believed

> that is competent and relevant and germane to the issue of consciousness of guilt and it also is highly relevant that we show the effects and how the arrest took place of an individual who is wanted foremost for any crime, especially for murder.

Edison, unable to make bail, escaped while incarcerated in the Baltimore City Jail awaiting trial on charges of the murder of Ellis and the attempted murder of Kane. The

prosecutor contended that if each indictment were tried separately, evidence of the offenses would be mutually admissible. At the trial of any one of the indictments, the prosecutor declared, the State would be "allowed properly to show the resistance to the officer, the flight from the officer, the attempt upon the officer's life, they are all germane and relevant to the investigation of the original murder of Ernie Ellis." And, the prosecutor opined:

> Whether or not we called the indictment, we would also be allowed ... under competent evidence, because it is relevant and germane to the issue, to show the flight from the city jail....

Defense counsel suggested that "it may well be that Mr. Edison did not know he was charged with the murder of Ernie Ellis." The judge indicated that would be a matter of defense. Defense counsel thought it relevant on the motion "because there was another charge pending against [Edison] when he was fleeing that is unrelated to any of this." It was brought out that on 23 October 1986, about two weeks before the incident involving Kane, Edison had been stopped by the police and found to have a bottle of pills in his possession. He was released pending a chemical analysis of the pills. When they proved to be contraband, a warrant was issued for the arrest of Edison, but he had not been apprehended at the time Kane caught up with him. Defense counsel said even if Edison did not actually know that a warrant had been issued, he "could reasonably anticipate that there would be a warrant forthcoming." The judge suggested that "a jury could reasonably infer that [Edison] was fleeing because of his murder on July 16, 1986 even though you may present to the jury testimony that there may have been other charges that Mr. Edison could have been concerned about." Defense counsel "imagine[d] that the jury could [have so inferred]." But he did not think that "they should be allowed to because of the possible prejudice that is going to flow to Mr. Edison from that." He thought that

> the issue of prejudice to the defendant outweighs the savings and the court's time and the expediency and the

need for truth also that the State refers to by using the flight as evidence of that. The escape itself, if not the attempt. The murder also should be severed....

The judge bought the argument of the State. Without more ado, he ruled:

I am going to deny the motion to sever these cases. All three cases will be tried at this time.

We believe that what the judge had before him was sufficient then and there to alert him that a joinder of the indictments would fatally infect the trial, so that a denial of the motion for severance would be an abuse of discretion. Assuming, arguendo, however, that it was not, as the trial progressed, in the guilt stage, where the skeletal recounting of the facts by the State at the motion hearing were fleshed out by the evidence adduced, it became more and more clear that the joinder tended to deprive Edison of the fair and impartial trial to which he was entitled.

### III

We give a resume of the evidence the State put before the jury. It painted a sordid picture of life in the real world on the streets of the Cherry Hill section of Baltimore City. Underlying the crimes charged to Edison was illicit traffic in narcotics. It appeared that Cherry Hill was infested with several gangs. They were composed of drug dealers who sold to users and touters who solicited users for the dealers. The dealers compensated their touters at the end of the day in an amount which depended on the number of users referred. Each gang had a supplier from whom they obtained the contraband. The gangs had staked out territories in which they operated. But the competition was not always friendly. There was, at times, bad blood between the various gangs.

### A

#### *The Murder and Conspiracy Indictments*

Edison and his gang moved into the area. In addition to Edison, it included Steven Carter and Quintin Wiggins. The

Edison gang did not respect the staked out territories. They sold wherever they pleased. Sylvester Barry and Tyrone Carr composed another dealer group. Ellis was their touter. He was a user. Edison and Wiggins offered Barry and Carr "like a thousand dollars" for some of the same "product" which had been supplied to Barry and Carr. Barry and Carr went to their "boss" but he refused to sell or permit to be sold his "product" to the Edison gang. Barry testified: "that's when the run-in came with us and Joe Edison and Quintin Wiggins and his gang." Barry was afraid of Edison:

> [T]he history that gang had and he had, Joe Edison, with carrying a gun, yes, I was afraid of him.

Ellis made the mistake of telling Sharon Bagley, Carter's girlfriend, that Carter had killed someone called Reggie. Bagley told Carter what Ellis had said. Carter "just looked like a ghost or something scared him, you know, he just looked pale ... and he said if he tell you, then he'll tell the man ... the homicide people ... [the police]." On 16 July 1986, Barry and Carr were approached by Edison, Wiggins and Carter near the Hillside Apartments in Cherry Hill. Ellis was nearby but out of earshot. Edison and Wiggins talked to Barry. Edison's hands were inside his "dip." To Barry "that meant business."

> That mean if something that was told to you that you didn't do it, that meant your life was in danger.

Barry thought that his life was in danger and that Edison was armed. Wiggins told Barry that Barry and Carr were to walk Ellis to the back of the "164 School playground" so Edison could murder Ellis. Edison was "like you better do it, man." Barry said that he would not do it and started to walk away with Carr and Ellis. However, they walked in the direction of the schoolyard. Wiggins walked close behind so they could not tip off Ellis what was going on. Wiggins was "like walking to a drop-off point where Ellis would be."

> Joe Edison began dropping back behind us at that time. He came out of his pants. He fired one shot at Ernie

Ellis. It missed. It made [Ellis] turn to his left. The second shot hit [Ellis] below his eye. After Ernie hit the ground, a third shot was fired that hit him on top of his head.

Edison stood overtop of Ellis when "he flipped and his head hit the ground. He stopped overtop of Ernie and hit him again at the top of his head." Everybody fled. Edison ran through the woods and dropped off the gun somewhere. Later, Edison said that what he did was for all of us because Ellis was a "drug informer. He would have sent us all to jail.... Ernie was an informer." Edison's belief that Ellis was an informer was fed by the fact, as related by Egerton, and referred to by Edison in justifying the murder of Ellis, that on the day of the murder, "Officers Bradley and Shields conducted a street arrest for narcotics in the presence of Ernie Ellis and other people. Ernie was not arrested."

Ellis's body was found in the schoolyard. There were two gunshot wounds, one below the left eye and one on top of the head. An assistant medical examiner, accepted as an expert in the field of forensic pathology, described them in detail to the jury. She opined that the shots were fired at close range as indicated by a gunpowder stripling pattern around the entrance holes made by the bullets. The path of the wounds was "from upwards down and it was a straight shot." The shots occurred in a very short span of time. Two bullets were recovered from the body. The cause of death was the two gunshot wounds to the head, either of which would have been fatal. The manner of death was homicide. The autopsy report and the autopsy protocol photographs were displayed to the jury.

A police officer, Detective Harry Egerton, accepted as an expert in the investigation of both drug crimes and homicide, was in charge of the investigation of the crime. A number of photographs depicting the body at the crime scene were admitted in evidence and passed over to the jury. Bullet fragments taken from the skull of Ellis were shown to the jury. Egerton opined that "Ellis had been

shot at a rather close distance with a large caliber handgun." The detective's inclination at the time was that Ellis knew his assailant. The officer's "working hypothesis" gleaned from

> [t]he gunshot wound to the eye, the left eye, was lead stipling around it, which was powder or alleged shavings from the bullet burns in a particular pattern which I've studied before in homicide and from the geometric shape and disbursement of the stipling around the bullet hole, I had felt that whoever was the person who fired the shot into Mr. Ellis' eye was to the left of Mr. Ellis and possibly slightly to the rear of Mr. Ellis and within a reasonably close range.

The spent bullets recovered from Ellis's skull were submitted to "ballistics."

Joseph Kopera, assigned to "the Forensic Laboratory Division of the Baltimore City Police Department, firearms identification unit, ballistics" was accepted as an expert in the field of ballistics and gunpowder residue analysis. He examined the two spent bullets recovered from Ellis's body. They were .38 caliber and were fired from a revolver. Because of damage from hitting parts of Ellis's body, he was not able to compare them to a suspect gun.

Information received by Detective Egerton in his investigation of the homicide during the next few weeks after the murder, caused him to have Edison interviewed. Edison said that Ellis was a friend; they grew up together. Ellis was not one of Edison's customers but a touter for another gang. Edison said he was with Ellis on the evening of the homicide until about 7:30 p.m. About midnight Edison heard Ellis had been killed. Edison did not know who killed him. No one was with Ellis when Edison left him. Edison could not remember where he went after he left Ellis. Information received from interviews with four other persons proved to be conflicting—"[n]o two persons said the exact same thing. Everyone said something a little different." But the information led to a Sylvester Barry, nicknamed "Cat." Egerton talked to Barry at length with the

result that Barry went before the Grand Jury. On 25 October 1986, Egerton obtained warrants for the arrest of Edison, Wiggins, and Carter.

## B

### *The Attempted Murder Indictment*

Officer Darryl Kane of the Baltimore City Police Department, assigned to the Southern District drug enforcement unit, testified that on 6 November 1986, about 8:30 p.m., he was on routine patrol in uniform. He was aware of the warrant outstanding for the arrest of Edison for the murder of Ellis. He saw Edison, known to him "from [the officer's assignment in] Cherry Hill." Edison was standing on the corner with his hand in the front of his pants—his "dip." Egerton got out of his patrol car and called: "Joe, come here." He did not display his revolver. Edison "took off running." Egerton informed the dispatcher through the car radio that he was "into a foot pursuit and the direction [he] was running." Edison turned around during the course of his flight and extended his left arm as if he was gripping something. The officer could "just [see] a dark object in [Edison's] hand, because of street lights in the area, most of them were out." Officer Dale Fields, of the Southern District, responding to the radio call for back-up, arrived on the scene and Edison was apprehended. He was patted down and nothing was found. So Egerton retraced the course of the flight to try to find the object that Edison had pointed at him which he believed to be a gun. While he was searching for the object, Fields informed him by radio that a more thorough search of Edison's person had disclosed a gun.

When Officer Fields arrived on the scene, he saw Edison running with Kane chasing him on foot. Edison was apprehended near Russell Street and the Westport ramp. Fields cuffed Edison's hands behind his back and patted him down above the waist for the officer's safety. Kane had told Fields that Edison had a gun. Fields walked Edison

out to the ramp and conducted a thorough search. A gun was found in Edison's pants leg. "It was lodged in the pants leg, down at the ankle, on the inside of the leg." It was "wedged in there.... It was in a position where it did not fall out. It was not loose. We had to go up into the pant leg to retrieve the gun." There were 6 rounds of ammunition in the cylinder. One had a dented primer.

The weapon in Edison's possession was examined by Kopera, the ballistics expert. It was a .38 caliber revolver.[2] The gun was registered to a Henry Paul Taylor on 22 May 1971 but its whereabouts could not be traced from there until it was recovered from Edison. Kopera test fired it. The revolver was found to be operable and capable of being fired. The six cartridges in the gun were .38 caliber specials. On one of them "there was a light firing pin impression, which was on the back of the primer ... a component part of the cartridge."

> Those impressions were microscopically examined and found to be not deep enough or too light for comparison purposes meaning that that striking pin did not strike hard enough for the cartridge to go off, yet left a small dimple in it to show an attempt to fire that at one time.

The cartridge was examined by the jury. The revolver could be fired single action (the hammer pulled back by pressure on the hammer itself) or double action (the hammer pulled back by pressure on the trigger). The gun "worked properly in the single and double action mode." It did not misfire upon testing it. The other five cartridges were different from the misfired cartridge. The spent bullets recovered in Ellis's head were not fired from this gun—the land and groove markings made as the bullet went through the barrel were not the same.

It was not established that Edison actually knew that there was a warrant for his arrest for the murder of Ellis at

---

**2.** The transcript of Kopera's testimony indicates in some places that the weapon was a .28 caliber revolver. We believe that this was a typographical error or a mishearing on the part of the stenographer.

the time of his flight from Kane. In Egerton's attempt to locate Edison, he took the warrant to Edison's residence in Cherry Hill. Edison was not there and Egerton was not sure that he told Edison's mother the charge of the warrant. But she knew that it was an arrest warrant because he showed her the face of the document. He gave the mother his card and asked her

> to locate her son and have him contact me or if she could bring him in or if she could have him come in with an attorney. I gave her some options. But the main thing was that he had to turn himself in.

Edison phoned Egerton that evening. Egerton told him there was a warrant for his arrest and

> that he could come down to the office and I would explain to him what it was all about and we could take care of things there.

Edison said he would come in. Edison did not show up. Egerton next saw Edison after Kane apprehended him on 6 November 1986.

It seems, however, that on 23 October 1986, about two weeks before the incident involving Kane, Edison had been stopped by the police and found to have a bottle of pills in his possession. He was not arrested but permitted to go his way pending chemical analysis of the pills. When they proved to be contraband, a warrant was issued for the arrest of Edison. All of this was stated by defense counsel at the hearing on the motion for severance, as we have seen, part I B, *supra*. Defense counsel argued, at the time, that even if Edison did not actually know that a warrant had been issued, he "could reasonably anticipate that there would be a warrant forthcoming." During the discussion of the matter, defense counsel mistakenly indicated that Edison had been arrested when the pills were found. Edison denied that he had been arrested and released on bail. He interjected: "never locked me up. They was looking for me." So it appeared that he knew that he was wanted on a narcotics charge. But there was no evidence proffered

during the guilt stage of the trial with respect to the incident or the issuance of a warrant.

## C

### *The Escape Indictment*

After Edison was arrested on 6 November 1986, he was confined in the Baltimore City Jail, on a no bail status, pending trials for the murder of Ellis, the attempted murder of Kane, and conspiracy to distribute narcotics. He was housed on the fourth floor of a "therapeutic community annex" within the jail area. Passes could be obtained to visit the other three floors or the main jail building, connected with the annex by a tunnel. The officer on duty on the fourth floor on 9 February 1987 made a head count about 2:00 p.m. The count indicated that all the inmates in the fourth floor dormitory were accounted for although the officer did not know Edison by sight. The officer on the next shift discovered during his tour that Edison was missing. He notified his supervisor, the floor was "shut down" and a search for Edison was instituted. He could not be found. The Police Department was notified that Edison had escaped and recapture procedures were instituted.

Edison's version was that about 12:15 p.m. on 9 February 1987, he "got a call from the officer that [he] got a court release."

I packed my clothes and I left.... The officer wrote me a pass, you know, signed it, and I packed my clothes and everything and I went out the first floor, we walked from the fourth floor to the first floor, walk through the tunnel, showed the officer my pass, went upstairs through the grille, showed the officer my pass, and another grille, showed another officer my pass, then they opened the door at receiving, and showed him my pass and they put me in the bull pen then they called me, and I had to sign my name in front of the control center and give them my fingerprint, and I went to the rear gate where I had to sign my name and social security number.

He was out at that point. "After they lift the red gate up, you come out on Madison Street." Edison remained free until 17 September 1987 when he was apprehended. He said he was on the way to the Police Station to give himself up when the police stopped him.

The State adduced evidence to the effect that Edison had not been officially released on 9 February 1987. It introduced testimonial and tangible evidence that the records had been falsified. The records did not disclose the documents Edison claimed he signed, nor did they reflect his passage through the four grilles and two steel doors through which he would have to pass on his way to freedom. It appeared that pertinent records at the time, such as destination sheets or activity sheets, were kept, not by officers, but by inmates, referred to as "inmate clerks." The destination sheet allowing him to leave the annex, was false.[3]

## IV

■ The propriety of the denial of Edison's requests for separate trials of the indictments is governed by the "other crimes" rule. We pursue the matter in the following manner:

1) In the trial of the murder and conspiracy indictments: the admissibility of the evidence of the crimes charged in the attempted murder indictment.

2) In the trial of the attempted murder indictment: the admissibility of the evidence of the crimes charged in the murder and conspiracy indictments.

3) In the trial of the escape indictment: the admissibility of the evidence of the crimes charged in
 (a) the murder and conspiracy indictments;
 (b) the attempted murder indictment.

---

3. The procedure was changed after Edison's escape. The records are now maintained by jail officers.

In making this analysis we are mindful that a motion for judgment of acquittal was granted as to the crime of the possession of a handgun after having been convicted of a crime of violence, charged in the attempted murder indictment. Therefore, that crime is treated as if it had never been charged. We are also mindful that Edison stands acquitted under the attempted murder indictment of the crimes of the attempted murder of Kane and the use of a handgun in a crime of violence. And that no verdict was rendered on the charge of the assault and battery of Kane. But these crimes remain in play in the determination of what evidence of them is admissible at the trial of the murder and conspiracy indictments and the escape indictment.[4] A judge is not a seer; he cannot prophesy what verdicts a jury will return. Juries have been known, as is their right, to reach a not guilty verdict, despite very strong evidence of guilt, by way of compromise, or because of disbelief in the credibility of witnesses, or for a myriad of reasons known only to the jurors. Therefore, in our analysis of what evidence is admissible in the various trials, the decision of the judge is not to be tested by the jury's verdict in hindsight, but is to be considered in the light of the proffers and evidence before the jury at the time the judge made, or could have made, his final decision to join or separate the indictments for trial.

We approach the resolution of this appeal by following the three steps announced in *Faulkner*, 314 Md. at 634–635, 552 A.2d 896. We shall assume, for the purpose of decision, that the requirement of the first step—whether the evidence that relates to an offense separate from the offense the defendant is presently on trial—here fits, as a matter of law, within one or more of the exceptions to the general "other crimes" rule. With respect to the second step, the charge of possession of a handgun after having been con-

---

**4.** For example, the jury may well have been prejudiced simply by having the charge alleging that Edison had been previously convicted of a crime of violence go before it, even though that charge was subsequently withdrawn from the jury's consideration.

victed of a crime of violence was, as we have seen, judicially deleted by the grant of a motion for judgment of acquittal for lack of sufficient evidence. With the exception of that charge, a scanning of the evidence adduced readily shows that it was clear and convincing with respect to Edison's involvement in the other charges in the indictments. So this appeal settles down to the requirement of the third step. Even if the requirements of steps one and two are satisfied,

> [t]he necessity for and probative value of the "other crimes" evidence is to be carefully weighed against any undue prejudice likely to result from its admission.

*Faulkner* at 635, 552 A.2d 896. This requirement "implicates the exercise of the trial court's discretion." *Id.* "Thus," we iterate,

> "other crimes" evidence, even though independently and substantially relevant to some contested issue, may be excluded if its probative value is exceeded by potential jury hostility or unfair prejudice. The leeway of this discretion lies in the direction of excluding otherwise admissible evidence.... A decision to admit other crimes evidence which is clearly incorrect " 'on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion.' "

*Id.* at 641, 552 A.2d 896 (citations omitted).

## A

### 1

 In a separate trial of the murder and conspiracy indictments, evidence that Edison fled when Kane tried to arrest him would be admissible as showing consciousness of guilt. But the details of the attempted murder of Kane would lend little, if anything, to the establishment of the corpus delicti of the murder of Ellis, the conspiracy to murder Ellis, or of the criminal agency of Edison in those crimes. The details of the attempted murder would by far be too prejudicial for the slight additional probative value it

would give. There would be no necessity for evidence as to the details of the attempted murder. Such evidence would reach beyond a showing of consciousness of guilt indicated by the flight.

### 2

 In a separate trial of the attempted murder indictment, the fact that the police were seeking to apprehend Edison on a murder charge would be admissible to show the motive for the flight, which in turn would reflect a consciousness of guilt. Whether Edison actually knew that a warrant for his arrest for murder was outstanding was for the jury to determine. The details of the murder and conspiracy to murder—evidence tending to establish the corpus delicti of each of those crimes, and to show that Edison was in fact the criminal agent as to them—would not be necessary to prove the attempted murder and would unduly prejudice the jury.

### 3

#### (a)

 In a separate trial of the escape indictment, the only evidence relating to the murder and conspiracy indictments which would be admissible (as showing motive) would be that the reason for Edison's confinement included a charge of murder. The details of the murder and conspiracy to murder would lend nothing to the proof of the escape. There would be no necessity for such evidence and, again, it would unduly prejudice the jury.

#### (b)

 In a separate trial of the escape indictment, the only evidence relating to the attempted murder indictment, which would be admissible, would be evidence that Edison was charged with attempted murder. Such evidence would tend to show that his confinement was lawful. But evidence that he fled from the arresting officer and evidence

as to the details of the attempted murder would not be necessary to prove the escape. Again it would likely result in undue prejudice.

In summary, at a separate trial on each of the indictments, certain evidence, substantial in nature, of the crimes alleged in the other indictments would not be properly admissible. The mutuality of evidence test was not satisfied. The State had a strong case under each indictment, but it was not content. It chose to flavor its case by stirring all of the evidence it could muster on all the charges against Edison into one pot, and the judge went along. But what the State believed to be a clever stratagem spoiled the broth. The strategy it employed provided too strong a flavor for the liking of the Federal and State Constitutions with their guarantee of a fair trial before an impartial jury.

We are constrained to conclude that the trial judge did not heed our caution set out in *Faulkner* at 640–641, 552 A.2d 896, that in his judicious determination of the probative effect of the evidence versus its prejudicial impact, he must weigh carefully the necessity for and probativeness of the evidence concerning the collateral criminal acts against the untoward prejudice which was likely to be the consequence of its admission. The result of placing before the jury the vast array of testimonial and tangible evidence, which would not be mutually admissible at separate trials of the various indictments, fatally tainted all the convictions. The necessity for and the probative value of the improper evidence was far exceeded by potential jury hostility or unfair prejudice. We believe that the joinder prejudiced Edison in all three of the aspects noted in *McKnight*, 280 Md. at 609, 375 A.2d 551. As he claimed, he was embarrassed, or confounded in presenting separate defenses. The jury may have cumulated the evidence of the various crimes charged and found guilt when, if the offenses were considered separately, it would not have done so. At the very least, the joinder of offenses may have produced a latent hostility, which by itself might have caused prejudice to his

case. And the jury may have used the evidence of one of the crimes charged, or a connected group of them, to infer a criminal disposition on the part of Edison from which he might have been found guilty of other crimes charged.

We think that the trial judge's decision to permit a joint trial of the indictments was clearly incorrect. Therefore, it was an abuse of his discretion. The convictions must be reversed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED;*

*COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*