647 A.2d 1243

**James Mitchell EMORY and Roger Lee Emory**

v.

**STATE of Maryland.**

**No. 1547, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Sept. 29, 1994.

590

592

Byron L. Warnken (Warnken & Warnken, on the brief), and John C. Fones (E. Thomas Maxwell, Jr., on the brief), Baltimore, for appellants.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, DAVIS and HARRELL, JJ.

MOYLAN, Judge.

The appellants, James Mitchell Emory and Roger Lee Emory, were convicted by an Anne Arundel County jury of nine and seven counts, respectively, charging drug kingpin conspiracy and related offenses. On this appeal, they contend:

1. that the trial court erred in admitting "other crimes" evidence;

2. that the evidence was not legally sufficient to sustain James Emory's conviction for importation or Roger Emo-

ry's conviction for possession with intent to distribute fifty
pounds of marijuana;

3. that the trial court erred in .denying the appellants'
motion to suppress physical evidence seized pursuant to
unconstitutionally issued search warrants;

4. that the trial court erred in denying the appellants'
motion to suppress keys found in James Emory's Ford
Explorer;

5. that the trial court abused its discretion in denying the
appellants' motion for a mistrial in that the prosecutor's
statements, in rebuttal closing argument, made the jury
believe that the Emorys must be guilty because they did not
testify, in violation of both the Fifth Amendment privilege
against compelled self-incrimination and the Maryland com-
mon law; and

6. that six sentences must be vacated, either under the
*Blockberger* required evidence test or under merger by
legislative intent.

We hold that the trial court erred in admitting "other
crimes" evidence. Under the circumstances, the appellants'
fifth and sixth contentions are moot. It behooves us, however,
to consider the second contention alleging the legal insufficien-
cy of the evidence to support several of the convictions be-
cause of the possible double jeopardy ramifications such a
holding might have should the State choose to retry the case.
In the exercise of our discretion, we choose also to address the
appellants' third and fourth contentions because a retrial on
the merits would not necessitate a rehearing on or reconsider-
ation of the suppression motions if we should decide that the
initial rulings were not incorrect.

### *"Other Crimes" Evidence*

The appellants were charged with having conspired 1) with
each other; 2) with three other named parties, to wit, Philip
Dulany, Lawrence Leiben, and George Thomas Johnson; and
3) with persons known and unknown to violate the anti-
narcotics laws in a variety of ways. It was charged in the

indictment, moreover, that all of the offenses alleged to have been committed by both appellants occurred during the seventeen-month period that ran from June 1, 1991 through October 29, 1992.

It was on October 29, 1992 that officers of the Anne Arundel County Police Department culminated their ten-month investigation. They obtained and executed twenty-one search and seizure warrants and arrested eleven individuals, including the appellants, for drug kingpin conspiracy and related offenses. The jury trial of the appellants was spread over twelve trial days. Thirty-two witnesses were called for the prosecution and seventy-six exhibits were offered in evidence.

A key witness against the appellants was Lawrence Leiben, a codefendant and co-conspirator who had entered into a plea arrangement with the State. He supplied significant inculpatory information with respect to both appellants and their activities during the seventeen-month period charged in the indictment. The critical issue now before us involves Lawrence Leiben's testimony with respect to various narcotics-related activities engaged in by the appellants at various times over the course of a twenty-year period preceding the commencement of the seventeen-month period charged in the indictment. Both by way of a motion *in limine* and by subsequent repeated objections during the course of Lawrence Leiben's testimony, the appellants amply preserved their challenge to this line of testimony.

The State argued that it was necessary to have Leiben's testimony go back over the course of twenty years in order "to show the relationship between these parties almost their entire adult lives." The appellants offered to stipulate that both of them had known Leiben socially since the late 1960's, that Leiben and James Emory had been members of the same Army Reserve unit, and that Leiben and both appellants had once worked on the same job. The State was nonetheless permitted to have Leiben recount in detail his earlier involvement with the appellants in the narcotics traffic. Indeed, a

full thirty-eight pages of transcript of Leiben's direct examination is devoted to these pre-1991 activities.

Leiben testified that he met James Emory in the late 1960's when they served together in the same Army Reserve unit. Through James, Leiben became acquainted with Robert Emory. He testified that at some time in the early 1970's, he, James Emory, and Philip Dulany together bought a pound of marijuana, split it up three ways, and then sold their respective shares to make approximately $100 of profit apiece. He further testified that James Emory then began selling marijuana on a more regular basis. At some time thereafter, Leiben began purchasing small amounts of marijuana from James Emory and then resold it for profit. He concluded that Roger Emory was James Emory's partner because "they were always together and they had the money in it together and Mitch [James Emory] told me they were partners."

Most of Leiben's knowledge about the drug-related activities of the appellants in the early 1970's was based simply on what had been told him by James Emory. Leiben testified that James Emory had told him that the father of the two appellants "had put some money up and that they [the father and both appellants] took a trip to Texas or Texas and Mexico and made a connection there and bought some marijuana and started selling it."

Leiben was questioned about whether the appellants, during the early 1970's, had developed "any other sources." He responded that there was "a fellow named Bud," with a last name that sounded German. James Emory confided in him that Bud was a large dealer who dealt in "Mexican Pot." Leiben indicated that his own purchases from James Emory were approximately "twenty pounds at a time," although on one occasion it might have been as much as "a bale of forty or fifty." He indicated that this arrangement that started in the 1970's continued "off and on until we were arrested." Because of that arrest, Leiben left Baltimore in approximately 1980 or 1981 and went to Florida. He remained in Florida, selling

automobiles, for three-and-a-half years. During that time, he had no connection with either appellant.

After that approximate three-and-a-half-year sojourn in Florida, Leiben returned to Maryland (he believed it was in 1984) because he "just wanted to live back in Maryland again." Initially, he resumed a legitimate relationship with James Emory, going to work for him at the Brandon Contracting Company at sometime "in '84 or '85." The Brandon Contracting Company was owned by James Emory and was involved in the sale of home improvements. Roger Emory also worked for Brandon Contracting.

At sometime while Leiben was working at Brandon Construction, he was approached, at the small shop he owned and where he slept, by James Emory, with Roger Emory possibly in attendance. Leiben was shown some "Thai Weed" or Thailand Pot, a very high potency and very expensive form of marijuana and asked if he wanted to sell some of it. Leiben agreed to do so and subsequently purchased the Thai Weed from James Emory in lots of one or two kilos. He explained that a kilo is 2.2 pounds and that the purchase price of the Thai Weed was between $1,800 and $2,200 a pound. Leiben would then sell it to his own customers in smaller units of quarter-pounds or ounces. That business relationship "lasted probably for ... two to three months and then it ran out." During the life of the relationship, there were "maybe two or three deliveries," involving a total of "probably eight kilos ... nine kilos." Leiben's only sure recollection was that it was delivered to him by James Emory. Whether Roger Emory was ever involved in a delivery was by no means certain. There was no testimony with respect to the involvement of any other persons in the Thai Weed operation and there was no testimony with respect to the source of the Thai Weed.

It was just at the time that the two-to-three-month involvement in the purchase of Thai Weed was coming to an end that the second phase of criminal dealing between Leiben and James Emory also came to an end. The reason for the termination of the relationship was that James Emory be-

lieved that Leiben had failed to make an $8,000 payment that was due to Emory. For his part, Leiben allegedly believed that he had paid the $8,000 and that James Emory had neglected to record or to remember the payment. "So, basically, we parted company at that time." To the best of Leiben's recollection, that second parting of the ways occurred at sometime in 1986. Leiben's employment with Brandon Construction was also terminated.

When asked initially whether he, after his return from Florida, resumed any illegal activities with James Emory, Leiben first indicated that he "fooled around a little bit with cocaine in small sales." It was extremely difficult to get Leiben to place the time of certain of his activities within the decade, let alone within the year. Under some probing, however, he subsequently placed his cocaine-related activities with James Emory into the time period between the second breakup (1986 or even 1987) and the final reconciliation (1991). He testified that the involvement in the cocaine trade "only lasted probably for a few weeks to a month." Leiben would purchase cocaine from James Emory in quarterpound quantities for approximately $1,100 an ounce. After several such purchases, however, that involvement came to an end because James Emory decided to call a halt to the activity. "Well, he wasn't really involved with that. He just didn't like doing it and didn't like using it and just stopped doing it." With respect to the brief trafficking in cocaine, there was no testimony linking Roger Emory or Philip Dulany or any other person to that activity. Nor was any reference made to the source of the cocaine. There was no suggestion made as to what relevance that brief foray into cocaine trafficking might have had to the crimes for which the appellants were tried.

After the "split up" over the arguable $8,000 default by Leiben, there was an approximate five-year break in the relationship between Leiben and the Emory brothers with respect to his purchasing of marijuana from them. In June, 1991, however, Leiben was invited to a birthday party honoring James Emory at Emory's new home on North Shore. James Emory and Leiben "more or less made up" and "talked

about maybe going back into business again together." The business relationship involving the sale of marijuana did resume and all of Leiben's testimony from that point on concerned criminal activity during the life of the conspiracy charged in the indictment, the seventeen-month period from June 1, 1991 through October 29, 1992.

All of Leiben's testimony as to prior activities, on the other hand, very definitely involved instance after instance, stretching out over two decades, not only of "other bad acts," generally, but of "other crimes," specifically, perpetrated by James Emory and, to a lesser extent, by Roger Emory. The issue before us is whether the trial judge erred in ruling such "other crimes" evidence admissible.

### A. A Rule of Presumptive Exclusion

■ The starting proposition with respect to "other crimes" evidence is that it should be excluded. That rule, of course, is subject to numerous exceptions but, pending proof of entitlement to one of the exceptions, the initial presumption is in favor of exclusion. Judge Adkins stated the general rule in *State v. Faulkner*, 314 Md. 630, 633, 552 A.2d 896 (1989):

We have often addressed the admissibility of "other crimes" evidence. Generally, "evidence of a defendant's prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial." Evidence of other crimes may tend to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant. (citations omitted).

The presumptively exclusionary focus of the rule was well explained by Judge McAuliffe in *Harris v. State*, 324 Md. 490, 500–501, 597 A.2d 956 (1991):

By stating the rule in exclusionary form—evidence of other bad acts is generally not admissible—followed by an exception for those instances in which the evidence 1) has special relevance, i.e. is substantially relevant to some contested issue in the case and is not offered simply to prove criminal character, and 2) has probative force that substan-

tially outweighs its potential for unfair prejudice, the focus is correct, and the burden is where it belongs....

... The exclusionary form of the rule clearly serves to remind the bench and bar that, unlike most other evidence, this evidence carries with it heavy baggage that must be closely scrutinized before admissibility is warranted. Finally, by employing the exclusionary approach, it is immediately clear that the party offering the evidence has a hurdle to overcome and must shoulder the burden of demonstrating relevance other than criminal character, as well as the burden of demonstrating that the probative value substantially outweighs the potential for unfair prejudice.

### B. Is the "Other Crimes" Evidence Substantially Relevant?

■ Notwithstanding the presumptive exclusion of "other crimes" evidence, such evidence may be admitted, subject to clearing two additional hurdles, if it is "substantially relevant to prove some contested issue" in the case. As *State v. Faulkner* explained, 314 Md. at 634, 552 A.2d 896:

Evidence of other crimes may be admitted, however, if it is *substantially relevant to some contested issue* in the case and if it is not offered to prove the defendant's guilt based on propensity to commit crime or his character as a criminal. (emphasis supplied).

See also *Ross v. State*, 276 Md. 664, 669, 350 A.2d 680 (1976). *Harris v. State*, 324 Md. at 500, 597 A.2d 956, used the term "special relevance" as synonymous with "substantial relevance to some contested issue."

That initial hurdle, let it be carefully noted, is not simply that the "other crimes" evidence be technically or minimally relevant to some formal issue in the case other than criminal propensity, but further 1) that the relevance be *substantial* and further still 2) that it be with respect to a *genuinely contested issue* in the case. In L. McLain, *Maryland Evidence*, § 404.5 at 354 (1987), this aspect of relevance is discussed:

There are, however, several caveats regarding limited admissibility of evidence of prior misconduct for some such other purpose. First, the evidence may not be used merely as a ruse to accomplish the prohibited objective. *The evidence must be strongly probative of an issue* other than propensity *which is truly a significant issue in the case.* This requirement may mean that the prosecution will be unable to present character evidence until it puts on its case in rebuttal. (footnotes omitted) (emphasis supplied).

C. McCormick, *Evidence,* § 190 at 564–565 (E. Cleary ed., 3d ed. 1984), addresses the same requirement:

[T]he connection between the evidence and the permissible purpose should be clear, and *the issue* on which the other crimes evidence is said to bear *should be the subject of a genuine controversy.* For example, if the prosecution maintains that the other crime reveals defendant's guilty state of mind, then his intent must be disputed. Likewise, if the accused does not deny performing the acts charged, the exceptions pertaining to identification are unavailing. (footnotes omitted) (emphasis supplied).

Dean McCormick cites two cases in support of his statement that the issue on which "other crimes" evidence is offered must be the subject of a genuine controversy. One is *People v. Golochowicz,* 413 Mich. 298, 319 N.W.2d 518, 524 (1982), where the Michigan Supreme Court held:

[E]vidence of other misconduct is not admissible in this state to negate mistake or accident, to prove motive, to show intent, to demonstrate the defendant's plan, scheme or system, or to prove his identity, *unless one or more of these factors are genuinely in issue*—not "in issue" in the sense that criminal intent, identity, [etc.] are nearly always in issue to some greater or lesser degree in every case, but in issue or "material" in the sense that they are *genuinely controverted matters.* (emphasis supplied).

The other cited authority is the English decision of *Thompson v. The King,* [1918] App.Cas. 221, 232, where the appellate court held:

The mere theory that a plea of not guilty puts everything material in issue is not enough.... The prosecution cannot credit the accused with fancy [defenses] in order to rebut them at the outset with some damning piece of prejudice.

*See also* J.B. Weinstein and M.A. Berger, 2 *Weinstein's Evidence* § 404[09], at 49–50 (1980) ("Evidence directed to a category other than propensity is not, however, admissible unless this issue is actually being controverted.")

### 1. The Standard of Appellate Review

■ The "other crimes" evidence testified to by Lawrence Leiben in this case failed to pass the first part of *Faulkner's* three-pronged test in that it was not "substantially relevant to some contested issue in the case," 314 Md. at 634, 552 A.2d 896. In terms of the standard of appellate review, this is a legal "call" as to which the trial judge is either right or wrong. There is no deference extended, as there would be with respect to primary or ancillary fact finding (where the judge is affirmed unless the fact finding is *clearly* erroneous) or with respect to discretionary rulings (where the judge is affirmed unless the ruling is a *clear abuse* of discretion). *Faulkner* on this point was clear, 314 Md. at 634, 552 A.2d 896, "That is a legal determination and does not involve any exercise of discretion."

### 2. The Issues, Even If Material, Were Not Genuinely Disputed

■ As we run the list of acceptable material issues as to which "other crimes" evidence is sometimes deemed to be logically relevant or probative, we see that the "other crimes" evidence here is twice bereft of evidentiary legitimacy. Not only is the evidence irrelevant as proof of the arguable issues as to which it might have been offered, but the issues themselves were not genuinely disputed. This trial, though hard fought, did not involve much by way of disputes on the ultimate factual merits. The disputes, moreover, were not of the type that "other crimes" evidence might help to resolve.

The defense consisted primarily of procedural counter-punching. It challenged, in a number of regards, the constitutionality of the search for and seizure of the physical evidence. It challenged the neutrality of the judge who issued the search warrants. It challenged the professional behavior of the chief prosecutor. It challenged the telephonic evidence. It challenged the State's compliance with discovery requests. It challenged proof of the *actus reus* of *importing*, as opposed to possessing locally, on the part of James Emory. It challenged proof of the *actus reus* of possessing *fifty pounds*, rather than merely forty-five pounds, of marijuana on the part of Roger Emory. The only thing the defense did not do was to assert factual innocence. For some medical research facility it might be otherwise but, for these appellants, there was no innocent explanation for possessing hundreds of pounds of marijuana in storage lockers in Anne Arundel County. They did not, except in the formal sense of entering a not-guilty plea, assert actual innocence. They attacked the constitutionality and the legality of the investigation. They attacked the propriety of the trial and pretrial process. These were all issues, of course, as to which "other crimes" evidence could have no pertinence.

### 3. *Motive*

Every catalogue of acceptable purposes for "other crimes" evidence begins with the classic five memorialized by the mnemonic acronym "MIMIC"—1) Motive, 2) Intent, 3) absence of Mistake, 4) Identity, and 5) Common scheme or plan. *Faulkner*, 314 Md. at 634, 552 A.2d 896; *Ross v. State*, 276 Md. 664, 669–670, 350 A.2d 680 (1976).

■ Motive is not a formal element of a crime but, rather, a circumstantial fact that sometimes may help to prove guilt.[1]

---

1. See Stone, "Exclusion of Similar Fact Evidence: America," 51 Harv. L.Rev. 988, 1026 (1938):

 "Motive, intent, absence of mistake, plan and identity are not really all on the same plane. Intent, absence of mistake, and identity are

"Which of the weekend guests had a motive to poison the baroness?" 2 *Weinstein's Evidence,* § 401[14] describes how "other crimes" evidence may sometimes be used to establish motive:

> Evidence of another crime has been admitted to show the likelihood of defendant having committed the charged crime because he needed money, sex, goods to sell, was filled with hostility, sought to conceal a previous crime, or to escape after its commission.

*See Veney v. State,* 251 Md. 182, 199–200, 246 A.2d 568 (1968) (evidence of armed robbery and of shooting of one police officer admissible to show motive for murder of second police officer who tried to arrest him). *See also Martin v. State,* 40 Md.App. 248, 389 A.2d 1374 (1978) (evidence that defendants had escaped from prison, to show motive for stealing car of kidnapping and sex offense victim, should not have been admitted because motive was clear and unequivocal and was not an issue in the case); *Jackson v. State,* 87 Md.App. 475, 485–487, 590 A.2d 177 (1991); *Stancil v. State,* 78 Md.App. 376, 383, 553 A.2d 268 (1989).

There is, of course, a great deal of arbitrariness that goes into the categorizing of admissible "other crimes" evidence into discrete kinds or types of relevance. Showing that a defendant had a motive to commit a crime simply helps to establish that he had the requisite *intent* to commit the crime. Showing which suspect had a motive to commit a crime, moreover, also helps to establish the *identity* of the criminal. Furthermore, the demonstrated possession of a motive helps to show that the criminal act was *neither a mistake nor an accident.* Material purposes significantly overlap.

■ In any event, Leiben's recounting of criminal activities, primarily on the part of James Emory, dating back largely to the 1970's did not supply a motive for the criminal conspiracy running from June 1991 through October 1992. The "other

---

facts in issue—*facta probanda.* Motive, plan, or scheme are *facta probantia,* and may tend to show any *facta probanda.*"

crimes" evidence in this case was simply not relevant in proving a criminal motive on the part of either appellant. The presence or absence of a motive, moreover, was not a genuinely contested issue in this case.

### 4. Intent

■ Except for the trial of a *malum prohibitum*, intent is a formal element in every criminal trial. 2 *Weinstein's Evidence,* § 404[12] gives illustrative examples of when intent is genuinely in issue and when evidence of prior crimes is relevant to prove intent:

> Consequently, evidence of another crime which tends to undermine defendant's innocent explanation for his act will be admitted; the oftener a like act has been done, the less probable it is that it could have been done innocently. . . . A claim of intoxication raises an issue of intent, and so, according to some courts, does a claim of entrapment.

*And see Anaweck v. State,* 63 Md.App. 239, 492 A.2d 658 (1985).

■ On the issue of whether either of the appellants had the criminal intent to deal in marijuana in 1991 and 1992, however, it was not permissible to show that James Emory engaged in similar crimes, presumably intentionally, twenty years or even five years earlier. That would be a classic forbidden instance of proving present intent by demonstrating a criminal propensity. In *Harris v. State,* 324 Md. 490, 597 A.2d 956 (1991), a case where the intent to distribute was "very much an issue," *Id.* at 501, 597 A.2d 956, the Court of Appeals held that it was improper, in an effort to prove present intent, to use even actual convictions for possession with intent to distribute that were two and one-half years old. "Unless we are to hold, as some courts apparently have, that proof of intent may always be shown by proof of propensity or disposition, we cannot square the admission of this evidence with the policy decisions previously made and reflected in the rule of evidence we have approved." *Id.* at 501, 597 A.2d 956.

In *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976), the State introduced, much as in the case before us, evidence of narcotics sales by the defendant at an unspecified time as much as fifteen years earlier. In reversing the conviction, Judge Levine commented on the irrelevance of the "other crimes" evidence on the issue of intent:

> Although specific intent to distribute heroin was an essential element of the crime of which appellant was convicted, the evidence that at some unspecified time or times during the period "from 1958 up to the date in question, February 6, 1973," the informer and the accused had "work[ed] together selling narcotics" no more showed such intent than it established any of the other exceptions to the general rule.

276 Md. at 671, 350 A.2d 680.

■ Even if the law were otherwise, however, with respect to how to prove present intent, the further impediment to the use of "other crimes" evidence in this regard was that the presence or absence of criminal intent was never an issue in the trial of this case. There was no conceivable innocent explanation for what the appellants were proved to have done and they at least had the good grace, if nothing else, not to insult the court with fantasies. One does not unintentionally store hundreds of pounds of what one knows to be marijuana in storage lockers.

The "other crimes" evidence in this case was not relevant in proving a criminal intent on the part of either appellant. The presence or absence of a criminal intent, moreover, was not a genuinely contested issue in this case.

### 5. *Absence of Mistake or Accident*

■ The analysis is the same with respect to absence of mistake or accident. The appellants never argued that their apparent involvement with marijuana was somehow an inadvertent and bizarre mistake. There was, therefore, no claim, proffer, or theory of mistake that needed to be negated.

L. McLain, *Maryland Evidence* § 404.12, at 368, makes very clear the nature of the situation or problem contemplated by this exception:

> If the defendant admits that he or she took an action, but claims to have done so unintentionally or by mistake, so that allegations of, for example, forgery, fraud, embezzlement, or malice are unfounded, the prosecution may offer evidence of his or her similar prior wrongs, acts, or crimes. This use of the evidence as proof of absence of mistake is merely the obverse of proof of intent.

> Similarly, the defendant may claim the harm he or she is alleged to have caused was not at his or her hands, but was the result of an independent accident. Evidence of prior similar acts is then admissible to show lack of mistake or accident. For example, if a defendant charged with child abuse contends that the child's injuries were caused by an accidental fall, evidence of prior beatings of the child by the defendant will be admissible. (footnotes omitted).

*See, e.g., Hoes v. State,* 35 Md.App. 61, 368 A.2d 1080 (1977) (evidence that defendant had on two prior occasions, four and five years earlier, shot his girlfriend was admissible *to negate his claim,* when charged with shooting his girlfriend, *that his shotgun had discharged accidentally* ); *Dyson v. State,* 6 Md.App. 453, 456, 251 A.2d 606 (1969) (in prosecution for murder and child abuse where defendant claimed that injuries were accidental, photographs showing prior abuse of the same victim were admissible *to negate claim of accident* ).

In *McKinney v. State,* 82 Md.App. 111, 570 A.2d 360 (1990), the defendant was asked, on cross-examination, whether he could have touched his alleged sexual assault victim "accidentally or incidentally." He answered, "It's possible." In reversing, we held that that was not enough to constitute a genuine assertion of a defense based on mistake or accident. Judge Bloom explained, 82 Md.App. at 125, 570 A.2d 360:

> *Appellant never asserted a defense of accident or mistake;* the only disputed issue in each case was whether there had been any touching of any . . . intimate parts. The combined

testimony of the three alleged victims might very well have tended to disprove any defense based on accident or mistake, but *since no such defense was asserted, there was no material fact to be established by the "other crimes" evidence.* (emphasis supplied).

The "other crimes" evidence in this case was not relevant in proving the absence of mistake or accident with respect to either appellant. The question of a mistake or an accident, moreover, was not a genuinely contested issue in this case.

### 6. *Identity*

The leading analysis of the identity exception is that in *State v. Faulkner,* 314 Md. 630, 637–640, 552 A.2d 896 (1989). Judge Adkins looked initially at the threshold requirement of relevance, observing that,

[E]vidence of other offenses may be received under the identity exception if it shows any of the following:

(a) the defendant's presence at the scene or in the locality of the crime on trial;

(b) that the defendant was a member of an organization whose purpose was to commit crimes similar to the one on trial;

(c) the defendant's identity from a handwriting exemplar, "mug shot," or fingerprint record from a prior arrest, or his identity through a ballistics test;

(d) the defendant's identity from a remark made by him;

(e) the defendant's prior theft of a gun, car or other object used in the offense on trial;

(f) that the defendant was found in possession of articles taken from the victim of the crime on trial;

(g) that the defendant had on another occasion used the same alias or the same confederate as was used by the perpetrator of the present crime;

(h) that a peculiar *modus operandi* used by the defendant on another occasion was used by the perpetrator of the crime on trial;

(i) that on another occasion the defendant was wearing the clothing worn by or was using certain objects used by the perpetrator of the crime at the time it was committed;

(j) that the witness' view of the defendant at the other crime enabled him to identify the defendant as the person who committed the crime on trial.

*Id.* at 637–638, 552 A.2d 896. Illustrative cases dealing generally with the identity exception are *Simms v. State*, 39 Md. App. 658, 663–666, 388 A.2d 141 (1978) and *Mollar v. State*, 25 Md.App. 291, 333 A.2d 625 (1975).

Although *Ross v. State*, 276 Md. 664, 670, 350 A.2d 680 (1976), characterizes it as an exception in its own right, it is generally recognized that the so-called "peculiar *modus operandi*" phenomenon is simply a subset of the "identity" exception. It is, indeed, so classified by *State v. Faulkner*, 314 Md. 630, 637–638, 552 A.2d 896 (1989). C. McCormick, *Evidence*, § 190 at 559–560 (E. Cleary ed., 3d ed. 1984), describes this modality for proving identity:

To prove other crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies or rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature. (footnotes omitted).

Professor McLain not only characterizes proof of a peculiar or unique *modus operandi* or signature as an aspect of the identity exception but also gives a good example of how it might be used:

[I]f on the prior occasions [the defendant] had used a unique way of defeating a burglar alarm, and the same method was

used by the perpetrator of the crime with which he is charged, the evidence may be admitted as proof of identity.

L. McLain, *Maryland Evidence* § 404.11, at 367.

The leading Maryland cases dealing with a peculiar *modus operandi* or a signature offense are *McKnight v. State*, 280 Md. 604, 612–614, 375 A.2d 551 (1977), a joinder/severance case, (signature or unique *modus operandi* not established); *State v. Brown*, 327 Md. 81, 87, 607 A.2d 923 (1992) (signature or unique *modus operandi* not established) and *State v. Faulkner*, 314 Md. 630, 638–640, 552 A.2d 896 (1989) (signature or unique *modus operandi* was established).

 James Emory's sales of marijuana to Lawrence Leiben did not establish, in any of the prescribed ways, James Emory's identity as one of those involved in the charged criminal activity of 1991 and 1992. Identity, moreover, was not remotely a contested issue. In L. McLain, *Maryland Evidence*, § 404(11), at 366, Professor McLain illustrates a way in which identity might be genuinely disputed: "When identity is in issue, as when a criminal defendant . . ., raises an alibi defense, proof of other crimes . . . committed by the defendant may be admitted." In *Tichnell v. State*, 287 Md. 695, 699, 713 n. 5, 415 A.2d 830 (1980), prior crimes evidence was deemed inadmissible to prove identity because the defendant had admitted being at the scene and shooting the victim and identity, therefore, was not a genuinely contested issue. In this case, the defense offered no alibi or a claim of misidentification or functional equivalent thereof.

The "other crimes" evidence in this case was not relevant in proving the identity of either appellant. Identity, moreover, was not a genuinely contested issue in this case.

### 7. *Common Scheme or Plan*

L. McLain, *Maryland Evidence*, § 404.9 at 361–362, is instructive with respect to the "common scheme or plan" exception:

Wrongful acts planned and committed together may be proved in order to show a continuing plan or common scheme....

With regard to proof of "common scheme", the Court of Appeals has suggested that there must be evidence that the crimes involved were conceived of by the defendant as part of one grand plan; the commission of each is merely a step toward the realization of that goal. The fact that the crimes are similar to each other or occurred close in time to each other is insufficient. (footnotes omitted).

In *State v. Jones,* 284 Md. 232, 395 A.2d 1182 (1979), a case from the partially overlapping field of joinder/severance law, the Court of Appeals held that upon the trial of the defendants for the armed robbery of a liquor store, the fact that they had committed two similar holdups within the preceding two and one-half hours was not admissible as proof of a common scheme or plan, absent evidence that all three crimes had been planned together. The Court observed:

In order to gain admission under this exception it is necessary that the crimes "so relate to each other that proof of one tends to establish the other." In other words, to establish the existence of a common scheme or plan, it is necessary to prove that the various acts constituting the offenses naturally relate to one another by time, location, circumstances and parties so as to give rise to the conclusion that they are several stages of a continuing transaction.

The State argues that the record establishes a pattern of criminal conduct within a period of two and one-half hours by the same parties in the same geographical area and that this evidence suffices to show a plan under the exception. We note first of all, that mere proximity in time and location within which several offenses may be committed does not necessarily make one offense intertwine with the others. Immediateness and site are not determinative. Nor does the fact that the offenses were committed by the same persons qualify them to be admitted under the exception. (citations omitted).

*Id.* at 243, 395 A.2d 1182. Perhaps the definitive analysis of the exception was that made by Judge Digges in *Cross v. State,* 282 Md. 468, 475–476, 386 A.2d 757 (1978):

> As a general rule, in order to gain the admission of evidence of other criminal acts under the common scheme or plan exception it is necessary that the crimes, including the crime charged, so relate to each other that proof of one tends to establish the other. Moreover, there must be "not merely a similarity in the results but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.* The concurrence of common features under this exception, however, must be more than simply a manner of operation, which is possessed to some extent by most criminal recidivists. A method of operation is not, by itself, a common scheme, but merely a repetitive pattern. Thus, evidence of other crimes can be introduced under the common scheme exception *only when the relationship between the time, place, circumstances, or parties involved in the crimes is such that the uncharged crime or crimes* "support the inference that there exists a single inseparable plan encompassing both the charged and uncharged crimes, typically, but not exclusively, embracing uncharged crimes committed in order to effect the primary crime for which the accused has been indicted." (emphasis in original) (citations omitted) (emphasis supplied).

The "other crimes" evidence in this case was not relevant in proving a common scheme or plan. The existence of a common scheme or plan, moreover, was not a genuinely contested issue in this case.

### 8. *Sexual Propensity*

The exception whereby "other crimes" evidence may be admitted to show that the defendant has a passion or propensity for illicit sexual relations with the particular victim concerned in the crime on trial, *Berger v. State,* 179 Md. 410, 414, 20 A.2d 146 (1941); *Ross v. State,* 276 Md. 664, 670, 350 A.2d 680 (1976); *Vogel v. State,* 315 Md. 458, 465, 554 A.2d 1231

(1989); *Acuna v. State,* 332 Md. 65, 72–76, 629 A.2d 1233 (1993), obviously has no applicability to the case under review.

### 9. Close Connection

It is permissible to use "other crimes" evidence where several offenses are so connected in point of time or circumstances that one cannot be fully shown without proving the other. *Ross v. State,* 276 Md. 664, 670, 350 A.2d 680 (1976); *Tichnell v. State,* 287 Md. 695, 712, 415 A.2d 830 (1980) (a case from the partially overlapping field of severance/joinder law).

There is a significant overlap of, or at least significant confusion between, this exception and that involving a common scheme or plan. To the extent to which there is a definitional integrity to the distinction between the two, the notion of a common scheme or plan seems to suggest a functional or progressive connection as one crime triggers or, at least, sets the stage for the next. In the alternative, the several crimes are similar effects proceeding from a common cause. In either event, there is some sort of a cause-and-effect relationship at work.

When, by contrast, the case law speaks, as does for example *Ross v. State,* of an exception for crimes so connected in point of time or circumstances that one cannot be fully shown without proving the other, the contemplated connection seems to be more narrative than functional. The unities of time, space, and circumstance make it difficult to fragment too finely the narrative of a criminal episode even when there is no necessary cause-and-effect relationship between its parts.

If the "other crimes" evidence is relevant in any event, it does seem foolish to anguish over which label it depends upon for its admissibility. This, however, may be one of the costs attendant upon our conceptualization of the "other crimes" evidence rule as exclusionary rather than inclusionary. *Harris v. State,* 324 Md. 490, 597 A.2d 956 (1991).

In *Tichnell v. State,* 287 Md. 695, 712, 415 A.2d 830 (1980), Chief Judge Murphy described this category:

One such exception permits the admission of evidence of other crimes when the several offenses are so connected or blended in point of time or circumstances that they form one transaction, and cannot be fully shown or explained without proving the other.

In *Presley v. State,* 224 Md. 550, 558, 168 A.2d 510 (1961), evidence of anal penetration was admitted in the trial of a rape case because it was closely related in time and was part of the larger criminal episode. *Presley* did, somewhat dubiously, categorize the evidence as showing a "common scheme of sexual gratification." *See also Tinnen v. State,* 67 Md.App. 93, 99, 506 A.2d 656 (1986) (crimes were part of one "continuous transaction"); *Hicks v. State,* 3 Md.App. 225, 238 A.2d 577 (1968) (evidence that the defendant took a second little girl upstairs and told her to take off her bathing suit, minutes after he had committed statutory rape of prosecutrix, was admissible as part of what the court quaintly characterized as the *"res gestae"*).

In a joinder/severance context, we held in *Green v. State,* 81 Md.App. 747, 569 A.2d 741 (1990) that the defendant was properly tried jointly for two gas station robberies committed within half an hour. We observed, "The episodes were so intertwined that proof of involvement in either would have been admissible to help prove criminal agency with respect to the other." *Id.* at 751, 569 A.2d 741. There are in that passage also overtones of the identity exception. As Dean McCormick has observed, however, the lists of exceptions thus far compiled are "neither mutually exclusive nor collectively exhaustive." C. McCormick, *Evidence* § 190 at 558 (E. Cleary ed., 3d ed. 1984).

█ In the case before us, there is no such close connection between the charged crimes of 1991 and 1992 and the "other crimes" of the 1970's and 1980's that the story of the former could not have been fully shown without reference to the latter.

It is in this regard, perhaps, that the State made its claim that a showing of the relationship between the appellants and

Lawrence Leiben during the preceding twenty years was necessary to explain the willingness of the appellants to trust him in 1991 and 1992. The appellants were willing to stipulate, however, that there had been an essentially life-long social relationship and friendship among the three. The *criminal* nature of the earlier phase of that relationship was by no means critical to an understanding of or acceptance of Lawrence Leiben's involvement in the conspiracy of 1991 or 1992.

The State's insistence on the logical imperative of telling the whole story of the relationship between Lawrence Leiben and the appellants is very akin to its similar insistence on recounting the entire course of an investigation, which we discounted in *Zemo v. State,* 101 Md.App. 303, 646 A.2d 1050 (1994):

> The jury, of course, has no need to know the course of an investigation unless it has some direct bearing on guilt or innocence. That an event occurs in the course of a criminal investigation does not, *ipso facto,* establish its relevance. A valid criminal trial might well consist of nothing more than evidence of the *corpus delicti* of a crime on the East Coast on January 1 followed by the confession of the perpetrator on the West Coast on December 31. What the East Coast investigators did in the intervening year could be completely immaterial, just as could the intervening history of the perpetrator....

> The State's theory that the course of an investigation somehow must be shown, pertinent or not, assumes that a criminal trial should unfold upon the stage of the courtroom with the unbroken linear quality of a silent movie. Modern audiences, however, both in the jury box and out, are capable of "leaping o'er time and space" as relevance and admissibility dictate.

The intelligibility, the narrative flow, and the persuasiveness of the testimony of Lawrence Leiben would not have been noticeably impaired had he first landed on Planet Earth in June of 1991. His pre–1991 history was of minuscule significance and we really didn't need to know what he had been doing before that time.

### 10. Opportunity

*State v. Faulkner*, 314 Md. 630, 634, 552 A.2d 896 (1989); *State v. Edison*, 318 Md. 541, 547, 569 A.2d 657 (1990), a joinder/severance case; *Harris v. State*, 324 Md. 490, 501 n. 3, 597 A.2d 956 (1991); and *Solomon v. State*, 101 Md.App. 331, 646 A.2d 1064 (1994), all classify "Opportunity" as a distinct exception to the exclusion of "other crimes" evidence. C. McCormick, *Evidence* § 190 at 563 (E. Cleary ed., 3d ed. 1984) at 563, describes it as evidence tending

> to establish opportunity, in the sense of access to or presence at the scene of the crime or in the sense of possessing distinctive or unusual skills or abilities employed in the commission of the crime charged.

*McCormick* cites *United States v. Barrett*, 539 F.2d 244 (1st Cir.1976) (evidence admissible to show familiarity with sophisticated means of neutralizing burglar alarms) and *United States v. DeJohn*, 638 F.2d 1048, 1053 (7th Cir.1981) (earlier thefts from YMCA mailbox "highly probative of defendant's opportunity to gain access to the mailboxes" in case on trial). In a sense, of course, this is just another way of proving *identity.*

In the case before us, the "other crimes" from the 70's and 80's are not relevant to the establishment of an opportunity for the appellants to have committed the 1991–1992 conspiracy. Neither the presence nor the absence of an opportunity, moreover, was in any way an issue, let alone a contested issue, in this case.

### 11. Preparation

*State v. Faulkner*, 314 Md. 630, 634, 552 A.2d 896 (1989); *State v. Edison*, 318 Md. 541, 547, 569 A.2d 657 (1990), a joinder/severance case; *Harris v. State*, 324 Md. 490, 501 n. 3, 597 A.2d 956 (1991); and *Solomon v. State*, 101 Md.App. 331, 646 A.2d 1064 (1994), all classify "Preparation" as a distinct exception to the exclusion of "other crimes" evidence. Professor McLain describes the exception:

Evidence of prior crimes, wrongs, or acts may be admitted as proof of preparation for the act which is the subject of the trial. For example, a criminal defendant charged with bank robbery may be shown to have stolen a car to be used for the get-away. Similarly, a defendant who has accomplished a "sting" and is being sued for civil or criminal fraud may be shown to have committed criminal acts in order to obtain the materials used in setting up the "mark." (footnote omitted).

L. McLain, *Maryland Evidence* § 404.8, at 361. *See also Bevans v. State,* 180 Md. 443, 447, 24 A.2d 792 (1942); *Kanaras v. State,* 54 Md.App. 568, 595, 460 A.2d 61 (1983); and *Johnson v. State,* 9 Md.App. 327, 333, 264 A.2d 280 (1970).

 The random sales of marijuana by James Emory to Lawrence Leiben, ending in 1987 in any event, were not relevant to prove preparation for the conspiracies of 1991 and 1992. Preparation, moreover, was not in any way an issue in the case.

### 12. Plan

Although *State v. Faulkner, State v. Edison, Harris v. State,* and *Solomon v. State* all classify "Plan" as a distinct exception to the exclusion of "other crimes" evidence, it is impossible to separate it from the "Common Scheme or Plan" exception. Whether subsumed into the "Common Scheme or Plan" exception or as an autonomous exception in its own right, it was not in any way an issue in the present case. The "other crimes" of the 70's and 80's, moreover, were not relevant to show any planning for the conspiracy of 1991–1992.

### 13. Knowledge

*State v. Faulkner,* 314 Md. 630, 634, 552 A.2d 896 (1989); *State v. Edison,* 318 Md. 541, 547, 569 A.2d 657 (1990), a joinder/severance case; *Harris v. State,* 324 Md. 490, 501 n. 3, 597 A.2d 956 (1991); and *Solomon v. State,* 101 Md.App. 331, 646 A.2d 1064 (1994), all classify "Knowledge" as a distinct

exception to the exclusion of "other crimes" evidence. Professor McLain describes the exception:

> When a claim, defense, or charge requires proof of knowledge, proof of other crimes, wrongs, or acts may be admissible on that issue. For example, in a prosecution for passing a bad check, if the prosecution proves only that the defendant tendered a personal check which was returned for insufficient funds, it will have failed to meet its burden of production of the evidence. It must also produce evidence that the defendant knew at the time of passing the check that her account contained insufficient funds and that she intended to obtain goods or services with it. Proof of her having passed bad checks three times in the prior two months will be admissible as circumstantial proof of that knowledge. (footnotes omitted).

L. McLain, *Maryland Evidence* § 404.10 at 364. *See also Kain v. State*, 222 Md. 511, 513, 161 A.2d 454 (1960); *Ward v. State*, 219 Md. 559, 150 A.2d 257 (1959); *Luery v. State*, 116 Md. 284, 288, 81 A. 681 (1911); *Bishop v. State*, 55 Md. 138 (1880); *Tinnen v. State*, 67 Md.App. 93, 98–99, 506 A.2d 656 (1986).

J.F. Murphy, Jr., *Maryland Evidence Handbook* § 518(E)(2) at 187 (1989), is of the opinion that the exception for knowledge, which is the "flip side" of the exception for absence of mistake, will be taking on enhanced significance as a result of *Dawkins v. State*, 313 Md. 638, 651, 547 A.2d 1041 (1988), which held that the defendant's "knowledge 'is an essential element in' simple possession" prosecutions.

■■■ In no way were the "other crimes" of the 70's and 80's relevant to show any knowledge on the part of either appellant with respect to the 1991–1992 conspiracy. In no way was knowledge a contested issue in the case.

### A Further Observation

The ever-growing list of exceptions to the exclusionary rule for "other crimes" evidence is obviously becoming so long that it is virtually unmanageable. At the very least, the mnemonic

acronym MIMIC has long since become so confusingly incomplete that it should be abandoned.

### Conclusion as to Substantial Relevance

The first prong of *Faulkner's* three-prong test requires an inquiry into the legal question of whether the "other crimes" evidence was substantially relevant to a genuinely contested issue in the case. We have concluded that the "other crimes" evidence as to which Lawrence Leiben testified was not substantially relevant to prove any conceivable issue we can conjure up. If that were not foreclosing enough, it would be equally fatal to the State's position that no conceivable issue as to which "other crimes" evidence might have been offered was in any way genuinely disputed in this case.

### C. The "Clear and Convincing" Burden of Persuasion

The appellants, however, level yet another charge against the "other crimes" evidence in this case. They claim that the State did not satisfy the second prong of *Faulkner's* three-prong test in that the evidence was not clear and convincing that the other crimes had ever, indeed, occurred. Although the fact the appellants will prevail on their first attack on the evidence renders this second allegation of error moot, we nonetheless think it worth discussing briefly for the benefit of bench and bar.

*State v. Faulkner,* 314 Md. 630, 634–635, 552 A.2d 896 (1989), articulates the second part of the three-part test as follows:

> If one or more of the exceptions applies, the next step is to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence. We will review this decision to determine whether the evidence was sufficient to support the trial judge's finding. (citations omitted).

*See also Lowdowski v. State,* 302 Md. 691, 728, 490 A.2d 1228 (1985).

What is being referred to, of course, is a burden of persuasion. The first question is that of who is it who must be persuaded clearly and convincingly. Since the persuasion is a prerequisite to a trial judge's ruling on admissibility, it self-evidently is the trial judge who must be thus persuaded. It is not the jury. Neither is it the appellate court. *Cross v. State,* 282 Md. 468, 478, 386 A.2d 757 (1978), was explicit in this regard:

> [I]n order to be admissible for the limited purposes enumerated in the appropriate exception, such evidence must be *clear and convincing to the trial judge.* (footnote omitted) (emphasis supplied).

Reference to that burden of persuasion is a guideline or message to the trial judge, in his ancillary fact-finding capacity, as to that degree of certainty he should feel about a defendant's involvement in other crimes before admitting evidence as to that involvement.

When it comes to appellate review, however, the question becomes that of whether the State met its *prima facie* burden of production with respect to the other crimes. A reviewing court looks only at the legal question of whether there was some competent evidence which, if believed, could persuade the fact finder as to the existence of the fact in issue. Evidence which is legally sufficient to persuade one fact finder to the bare preponderance level is, *ipso facto,* legally sufficient to persuade a second fact finder to the clear and convincing level and yet a third fact finder to the beyond-a-reasonable-doubt level. The questions of whether and of the degree to which legally sufficient evidence actually persuades is idiosyncratic with the fact finder. Because the weighing of evidence is the exclusive prerogative of the fact finder and does not impact on the purely legal question of whether some competent evidence is present to support a finding, evidence that is legally sufficient to satisfy one burden of persuasion is legally sufficient to satisfy any burden of persuasion. This is the "clearly erroneous" standard of appellate review. It was explicitly spelled out by *State v. Faulkner,* 314 Md. at 635, 552 A.2d 896:

We will review this decision to determine whether the evidence was sufficient to support the trial judge's finding.

*Vogel v. State,* 315 Md. 458, 467, 554 A.2d 1231 (1989) spoke to the same effect:

[I]t is first *our* duty to ascertain whether the evidence was sufficient in law to be "clear and convincing" to the judge. (emphasis in original).

■ The appellate court is concerned with the satisfaction of the burden of production. That burden of production does not shift with the shifting of the burden of persuasion. If there is an indication, however, that the trial judge employed the *wrong* burden of persuasion, a reversal will be called for.

On only one occasion have the appellate courts of this state ever reversed the admission of "other crimes" evidence on the ground that the evidence was not legally sufficient to permit a finding that the other crimes had ever occurred; that was in *Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978). That holding, however, did not depend upon the applicable burden of persuasion. *Cross* held that the evidence as to the other crimes was not legally sufficient to persuade the fact-finding judge to any level of persuasion. The State failed its burden of production:

[T]he evidence of the petitioner's involvement in the Buffington break-in ... was so deficient that it would not even suffice to create a jury issue.

*Id.* at 479, 386 A.2d 757.

■ In this case, Lawrence Leiben was a competent witness who testified under oath that various crimes occurred in the 1970's and 1980's. We know of no reason why such testimony was not legally sufficient to persuade the trial judge as to the occurrence of those crimes clearly and convincingly or, indeed, to any level of persuasion. *Vogel v. State,* 315 Md. 458, 554 A.2d 1231 (1989), makes it clear that a trial judge, in that ancillary fact-finding capacity, is not required to spread upon the face of the record the burden of persuasion he employs on this issue when he determines to admit "other

crimes" evidence. In the absence of indications to the contrary, it is presumed that the judge knew the applicable law and followed it. As *Vogel* held:

We see no reason to think that he did not apply the correct standard for the sufficiency of the evidence.

*Id.* at 472, 554 A.2d 1231.

From the State's point of view, however, this is a hollow victory.

### D. *Weighing Probative Value Against Prejudice*

Even if the State had not failed to clear the first of *Faulkner's* three admissibility hurdles, this is one of those rare cases where we would not hesitate to hold that it had failed to clear the third of those hurdles. Even when "other crimes" evidence 1) is found to be probative on a contested issue and 2) persuades the trial judge clearly and convincingly that it is true, there still remains a delicate balancing that the trial judge must perform between probative value to the State's case, on the one hand, and undue prejudice to the defendant, on the other. *State v. Faulkner,* 314 Md. 630, 635, 552 A.2d 896 (1989), described this third hurdle:

The necessity for and probative value of the "other crimes" evidence is to be carefully weighed against any undue prejudice likely to result from its admission. This segment of the analysis implicates the exercise of the trial court's discretion. (citation omitted).

Even though the abuse-of-discretion test is a highly deferential standard of appellate review, this is one of those rare cases where we would not hesitate to hold that the admission of the "other crimes" evidence constituted a clear abuse. For the State to prove that the appellants were guilty of the 1991–1992 conspiracy, the need for any reference to their criminality in the 1970's and 1980's was extremely slight, if not non-existent. Quite aside from need, the probative value of such evidence was minimal, if not non-existent. The prejudice to the appellants, on the other hand, was substantial. They were on trial for criminal conduct over the course of

seventeen months. They were shown to have been involved in similar crimes over a period of twenty years, to wit, over the course of their adult lifetimes. Their criminality, moreover, was virtually attributed to their genes as their father was implicated with them in the procurement of marijuana from Texas and Mexico decades before. Both appellants were shown to have a strong criminal propensity to engage in illicit trafficking in drugs.

Such prejudice might be tolerated as an acceptable price to pay if the State could show a compelling need. The weighing of a strong need against a heavy prejudice would be one of those close calls where an appellate court would be extremely loathe to second-guess the decision of the trial judge, whichever way it went. This, however, was not one of those close cases. On one side of the balance scale was heavy prejudice. On the other side was essentially nothing.

### The State's Alternative Theory: A Single Continuing Conspiracy

Although the State's argument is permeated with the language of and with references to the criteria of "other crimes" evidence law, it several times alludes to an alternative theory of admissibility. It claims that the entire involvement of Lawrence Leiben with the Emory brothers, from sometime in the early 1970's when they first agreed to split a pound of marijuana through October, 1992, was one continuing conspiracy. Even though only a seventeen-month period in 1991 and 1992 was charged as being the life of the conspiracy, the State claims that all of the testimony of Lawrence Leiben was not evidence of other crimes but, rather, evidence of the single collective crime charged.

The State's assertions in this regard are little more than conclusory. For the proposition that the State is not bound by the dates of an indictment in proving the existence of a conspiracy, the State cites the single case of *Manuel v. State,* 85 Md.App. 1, 20, 581 A.2d 1287 (1990). All that was involved in that case, however, was the successful effort of the State to

amend the conspiracy indictment so that it would begin on January 27, 1987 and embrace a thirteen-month period rather than begin on August 1, 1987 and embrace merely a six-month period. It simply does not deal with the type of situation for which the State is offering it as authority in this case. Its oblique reference to *Greenwald v. State*, 221 Md. 245, 250, 157 A.2d 119 (1959), is to a case where four similar acts of illegally evading marriage law requirements had all occurred within nine months of the one-day conspiracy charged in that case. The analysis under which evidence of the other acts was deemed admissible, moreover, was primarily that they constituted a common scheme or plan. Passing references to a continuing conspiracy as an alternative theory of admissibility were incidental.

The State failed to prove that the sales of marijuana from James Emory to Lawrence Leiben at sometime in the early or mid–1970's were part of the same conspiracy that existed in 1991 and 1992. Leiben was no vital part of any operation run by James Emory. He did not work for Emory on either a salary or a commission basis. He was a customer who purchased marijuana from James Emory and nothing more. He had no personal knowledge as to the source of the marijuana, as to the financing of the marijuana purchases, or as to the overall nature of the James Emory operation. His bits and pieces of information were based simply upon what James Emory, as a long-standing friend, told him. In any event, when Lawrence Leiben left for Florida in approximately 1980 and remained there for three-and-a-half years, he effectively withdrew from any conspiracy of which he may have been a part.

When he returned to Maryland, he involved himself in the purchase of Thai Weed from James Emory at sometime in the period 1985–1986. That involvement, however, lasted only for a two or three-month period. When he had his falling out with James Emory in 1986, he terminated all contact with any marijuana-related activities for a five-year period.

Lawrence Leiben did not have enough information to establish one way or the other whether the charged conspiracy of 1991–1992 was the same criminal operation that he remembered from the 1970's. Once he made his first break around 1980, he had only the one two-to-three-month involvement with James Emory over the course of the ensuing eleven years. During that one brief renewal, moreover, Leiben could testify to contact with no one other than James Emory, certainly to no knowledge of the details of some conspiratorial apparatus or organization. To assume a single, unbroken conspiracy continuing over an eleven-year gap wherein he had no more than three months of contact would be rank speculation.

To borrow the observation of *Ross v. State,* 276 Md. 664, 671–672, 350 A.2d 680 (1976), with respect to "other crimes" evidence:

> Proof that the accused had previously sold narcotics perhaps as long as 15 years before the crime charged in the indictment hardly tends to establish a disposition or propensity to commit the offense alleged, let alone an intent to do so.

Thus it is even with respect to conspiracy.

### Legal Sufficiency of the Evidence

Even though we are reversing the convictions because of the erroneous admission of the "other crimes" evidence, it still behooves us to address the respective claims of evidentiary insufficiency raised by the two appellants because of the possible double jeopardy repercussions should the State elect to retry them.

James Emory alone challenges the legal sufficiency of the evidence to support his conviction only on the charge of *importing* one hundred pounds or more of marijuana into the State of Maryland. It is a disingenuous challenge. He predicates the challenge on the fact that the testimony of Lawrence Leiben, on the basis of admissions made to him by James Emory, asserted that it was Philip Dulany and not James

Emory who physically transported the marijuana from New York to Maryland. Philip Dulany did it, however, at James Emory's direction, with James Emory's money, and in James Emory's car. Philip Dulany was a co-conspirator of James Emory and the acts of each co-conspirator are attributable to the others.

Quite aside from conspiracy law, James Emory was the principal directing what Philip Dulany did as one of his agents. Alternatively, James Emory was an accessory before the fact, encouraging and counseling what Philip Dulany did in advance of his doing it. Under yet another theory of complicity, James Emory could be deemed a principal in the second degree, aiding and abetting Philip Dulany in his various acts of importing. In every conceivable way, the evidence abundantly showed James Emory to have been guilty of importing thousands of pounds of marijuana into Maryland.

■■■ For his part, Roger Emory claims that the evidence was not legally sufficient to support his conviction for possessing with intent to distribute *fifty* pounds of marijuana. He claims that the only evidence that he possessed as much as *fifty* pounds came from the testimony of Lawrence Leiben, an admitted accomplice, and that it was not corroborated. Roger Emory acknowledges that "tally sheets" were recovered from his home and that FBI Special Agent Kent Paulin testified as to the significance of those tally sheets. Roger Emory bases his argument of non-corroboration exclusively on the fact that the "tally sheets," according to Agent Paulin, were only indicative of *forty-five* pounds of marijuana, rather than the requisite *fifty*.

■■■ Corroboration of the testimony of an accomplice, of course, need only be slight and need only show some connection between the defendant and the criminal activity or some association between the defendant and others involved in the crime. If Lawrence Leiben testified to fifty pounds or more and the "tally sheets" showed forty-five pounds, that is more than enough corroboration. The confirmation of Leiben's testimony to the extent of forty-five pounds of marijuana

tends to show that Leiben was not lying when he testified about even greater amounts. That is the function of corroboration. The need for corroboration does not imply a need for legally sufficient independent evidence of each and every ounce. If that were the case, the accomplice testimony would be reduced to surplusage.

Roger Emory also chooses to ignore the obvious fact that he is equally responsible with all of his co-conspirators and/or merely accomplices, as the case may be, for the combined criminal activities of the entire group. Roger Emory was jointly responsible for the marijuana found by the police in the storage locker at 20 Irdle Road in Glen Burnie—168.7 pounds. He was also jointly responsible for the marijuana found by the police in the storage locker at 8910 Fort Smallwood Road— 174.9 pounds. Agent Paulin testified that the combined "tally sheets" for the entire operation showed the purchase of a minimum of 2,857 pounds of marijuana at a total cost of $3,023,974. Roger Emory does not enjoy the benefit of a "cap" of forty-five pounds.

It is interesting to note, as one of the law's little oddities, that in assessing the legal sufficiency of the evidence in these two regards against both appellants, we may add into the equation their demonstrated criminal propensities as evidenced by the other and similar crimes they had both committed over the course of the preceding twenty years. As the case law regularly recognizes, this propensity to commit crime is strong and relevant evidence of guilt. That is the very reason it is so prejudicial.

As we have discussed at length, such evidence should not have been admitted. At a retrial, it will not be admitted. At the moment, however, we are assessing the legal sufficiency of the evidence not at the trial that *will be*, but at the trial that *was*. This is one of those rare occasions when the propriety of the evidence has nothing to do with the weight we may give it or, indeed, with whether we may give it any weight. We measure that legal sufficiency on the basis of all of the evidence in the case, that which was improperly

admitted just as surely as that which was properly admitted. *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). We are not suggesting that it was necessary, but if we have it before us, why waste it? [2]

In *Lockhart,* a reviewing court had vacated a *nisi prius* finding because certain evidence had erroneously been admitted against the defendant. Faced with a possible retrial, the defendant claimed that the remaining evidence, after the inadmissible evidence was subtracted, would not have been legally sufficient to support a verdict and that retrial should, therefore, be barred on double jeopardy principles. The Supreme Court rejected the notion, holding that the double jeopardy bar mandated by *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), for cases of legal insufficiency only comes into play when such evidentiary insufficiency is the *sole* basis for the reversal. For double jeopardy purposes, one does not subtract the inadmissible evidence and then measure the legal sufficiency of the remainder. One measures, rather, the legal sufficiency of all of the evidence, the inadmissible as well as the admissible.

In *Lockhart,* the Supreme Court reasoned, 488 U.S. at 40:

> *Burks* was careful to point out that a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary "trial errors" as the "incorrect receipt or rejection of evidence." While the former is in effect a finding "that the government has failed to prove its case" against the defendant, the latter "implies nothing with respect to the guilt or innocence of the defendant," but is simply "a determination that [he] has been convicted through a judicial *process* which is defective in some fundamental respect."

---

**2.** But for this delightful opportunity, we might have noticed that Roger Emory's claim of legal insufficiency, limited to the particularized argument that the evidence did not show a possession by him of as much as fifty pounds, was not adequately preserved for appellate review.

It appears to us to be beyond dispute that this is a situation described in *Burks* as reversal for "trial error"— the trial court erred in admitting a particular piece of evidence, and without it there was insufficient evidence to support a judgment of conviction. But clearly *with* that evidence, there was enough to support the sentence. (citations omitted) (emphasis in original).

It went on, 488 U.S. at 41–42, 109 S.Ct. at 291:

The basis for the *Burks* exception to the general rule is that a reversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence. A trial court in passing on such a motion considers all *of* the evidence it has admitted, and to make the analogy complete it must be this same quantum of evidence which is considered by the reviewing court.

### The Requested Franks Hearing

■ The appellants' primary attack on the search warrants is that they were erroneously denied a hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), in which they would have been permitted to go beyond the "four corners" of the warrant and to show that many of the allegations in the warrant application were deliberately false. The *Franks* case had, indeed, held that such a hearing might sometimes be available but only after a defendant had crossed a significant threshold:

To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or inno-

cent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

438 U.S. at 171, 98 S.Ct. at 2684.

The affiant on the warrant was Detective Michael Chandler. It is he who must be shown to have made statements that were deliberate falsehoods or that demonstrated a reckless disregard for the truth in order for a *Franks* hearing to be warranted. The hearing judge found from the proffers and arguments of defense counsel nothing to support a threshold finding in either of those regards with respect to Detective Chandler.

The appellants do not even claim that Detective Chandler was guilty of deliberate falsehoods. They allege, rather, reckless disregard for truth on his part. In support of that claim, they offer four instances of what they refer to, somewhat hyperbolically, as "blatant discrepancies between the warrant affidavits and the evidence provided to [the defense] through State's discovery." We affirm the ruling of the trial judge that they did not support a conclusion that Detective Chandler had been guilty of any reckless disregard of the truth so as to mandate a *Franks* hearing.

Roger Emory argues that, although the affidavit alleged that both Emorys travelled on numerous occasions to the storage facilities, the discovery that had been furnished to him and which he had gone over revealed only one visit on his part to a storage facility. The second claimed "blatant discrepancy" was also made by Roger Emory. He claimed that, although the affidavits characterized him as loading and unloading boxes at the storage facility, one item revealed to him on discovery showed that the police had seen him at the storage facility, to be sure, but only sitting in his automobile.

James Emory claims that the allegation in the warrant application that a homemade $1,000 money wrapper had been found in the trash at his home must have been false because it was not shown in the discovery furnished by the State. He

ignores the fact that at trial, a piece of tape with "700" written on it, which had been recovered from his trash, was offered in evidence by the State but not received when the defense objected. There is also the charge that the claim that James Emory had contacted a known drug dealer by the name of George Johnson by telephone on several occasions must have been false because it was not revealed in the pen registers that were furnished on discovery.

The defense does not allege that any of these four allegations were necessarily false. The charge is simply that they were not furnished on discovery. There was no showing by the defense, however, as to what was provided by way of discovery. Illustrative of the flimsiness of the defense claim is the admission made by the defense with respect to the pen registers on telephone calls. Defense counsel claimed that the calls referred to in the warrant application did not show up in the first "about 90 pages" of furnished discovery materials that the defense had been furnished. Defense counsel acknowledged, however, that there were three or four additional volumes of discovery material which the defense had not sifted through. The State asserted that it had made "open file" discovery available to the defense and the defense had not taken advantage of it.

In any event, there was simply no adequate demonstration of any deliberate disregard for truth on the part of Detective Chandler. The granting of a *Franks* hearing was not indicated.

### Canine Applicants vs. Canine Witnesses

The massively detailed applications for the search warrants in this case included, *inter alia,* several significant observations made by the police with the aid of "a trained certified drug dog." On October 20, 1992, the police took the drug-sniffing dog to the storage facility on Irdle Road, from which 168.7 pounds of marijuana were recovered nine days later. At the storage locker used by the conspirators, Unit H–44, the dog gave a positive alert for drugs. On the next day, October 21, the dog was taken to the Sentry Storage Facility on Fort

Smallwood Road, eight days before 174.9 pounds of marijuana were recovered from it. At that location in Unit A–270, the unit used by the conspirators, the dog gave a positive alert for drugs.

Both appellants now claim that this evidence, and some other peripheral olfactory reactions made by the dog, should not have been considered by the warrant-issuing magistrate in assessing probable cause. The appellants assert that an adequate predicate of reliability was not established as is arguably required by *Terrell v. State,* 3 Md.App. 340, 239 A.2d 128 (1968). *Terrell* is not remotely apposite. *Terrell* involved the admissibility of dog-sniffing evidence not in an *ex parte* warrant application, but at the ultimate trial on the merits. It was an armed robbery case where three robbers had apparently made a clean getaway. The police brought to the scene, however, "Rocky," who was a trained tracker. He led the police team up one alley, perpendicularly down another alley, across the street to a church lawn, and down a block further along a sidewalk. He stopped at a Plymouth automobile, wherein the police found, hiding, the three armed robbers.

The evidence was admitted because the State had first shown "the qualifications and experience of the dog." 3 Md.App. at 358, 239 A.2d 128. It was further shown how the dog had been placed on the trail and how there was no interruption in the tracking. The appellants are uncritically attempting to incorporate the prerequisites for trial admissibility into the far less formal setting of a warrant application. Actually, they are simply asserting that the *Terrell* prerequisites must be satisfied, without pointing out the significant difference between the two forums. We hold that the requirements for trial admissibility are not prerequisites to the use of the information in assessing probable cause.

A very similar situation was dealt with by the Court of Appeals in *Roberts v. State,* 298 Md. 261, 469 A.2d 442 (1983). In that case, a rapist was identified at trial because of the ability of a trained tracking dog, appropriately named "Sniffer," to follow a trail after having smelled a ski cap worn by the rapist and ultimately to pick out the defen-

dant from what was referred to as a "dog lineup." The Court of Appeals held the evidence to be admissible, relying in part on testimony detailing the training and the handling of Sniffer. In that case, as in *Terrell,* the question was the admissibility of the evidence at the ultimate trial on the merits. It does not follow in any way from *Terrell* or *Roberts* that there are any such requirements or qualifications that must be satisfied before the results from a canine sniff can be considered in a warrant application in the assessment of probable cause. By analogy, a confession must be shown to be voluntary before it may be introduced in court. A warrant application may make reference to a confession without any such qualification. A lineup identification must be shown to be reliable before it can be introduced in court. There is no such threshold requirement for it to be considered in a warrant application. Prior criminal records that may never be introduced in court are standard fare in a warrant application. The warrant-issuing process is *ex parte* and is far less formal than a courtroom proceeding.

The marijuana-sniffing dog in this case was certified and was regularly described in the warrant application as certified. In *United States v. Meyer,* 536 F.2d 963 (1st Cir.1976), a search warrant was attacked on the ground that the affidavit in support of the warrant simply stated that the dog was "trained" to detect drugs and that such was insufficient to establish its reliability. In rejecting the contention, the First Circuit said:

> Furthermore, the word "trained," when considered in the context of the affidavit, has a common and well understood meaning.... Assuming, therefore, that the magistrate was a qualified official possessing ordinary and reasonable intelligence and prudence it does not in our view defy logic to conclude that the magistrate understood that the "trained dog" was endowed, by reason of experience and training, with the ability to sniff out cocaine.

536 F.2d at 966.

A similar attack on the adequacy of a warrant application was made in *United States v. Venema,* 563 F.2d 1003 (10th

Cir.1977). The Tenth Circuit held that it was not necessary to go beyond characterizing the dog as trained and certified and that no further underlying facts had to be shown. It held:

> In this regard the defendant takes particular aim at the statement in the affidavit that Chane was a "trained, certified marijuana sniffing dog." Such, according to counsel, is a conclusory statement and does not sufficiently set forth the underlying facts so as to allow the issuing judge to exercise his independent judgment on the matter. We do not agree that Chane's educational background and general qualifications had to be described with the degree of specificity argued for by counsel.
>
> . . . . .
>
> We agree with the reasoning of *Meyer*, and the statement in the present affidavit that Chane was trained and certified as a marijuana-sniffing dog is sufficient.

563 F.2d at 1007.

*United States v. Sentovich*, 677 F.2d 834 (11th Cir.1982), dealt with a similar attack on the results of a dog sniff offered in a warrant application. It observed:

> His argument is that a mere statement that the dog had been trained in drug detection was not enough without an accompanying statement that the dog had proved reliable in the past and that an experienced handler was with the dog. . . . We believe, in any event, that his argument is without merit. The case on which Sentovich relies, *United States v. Klein*, 626 F.2d 22, 27 (7th Cir.1980), does state that statements that a dog had had training and had proved reliable in the past were sufficient indicia of the dog's reliability.

677 F.2d at 838 n. 8. *See also United States v. Daniel*, 982 F.2d 146 (5th Cir.1993); *United States v. Maejia*, 928 F.2d 810 (8th Cir.1991); *United States v. Massac*, 867 F.2d 174 (3d Cir.1989); and *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987).

### The Second Set of Keys

Critical to the operation of this marijuana-distributing conspiracy was the storage of large quantities of marijuana. When the Anne Arundel County police, on October 29, 1992, executed a total of twenty-one search warrants, one of them was for a storage facility located at 20 Irdle Road in Glen Burnie. The police used a bolt cutter to open storage locker H–44, which was secured by a padlock. Inside they found two large storage boxes of a type used to store tools on a construction site. Each of those boxes was secured by padlocks. In one box, the police found twenty-nine clear plastic bags of marijuana; in the other, they found twenty-five such bags. The total amount of marijuana recovered from that storage locker was 168.7 pounds.

The police executed a second search and seizure warrant at the Sentry Self–Storage Facility at 8910 Fort Smallwood Road. In Unit A–270 they found three boxes of the type used to store tools at a construction site. Each box was secured by a Master Lock. One box was empty except for some marijuana residue. A second box contained trash bags of marijuana. A third box had cardboard boxes containing bales of marijuana. Recovered from this second storage facility was a total of 174.9 pounds of marijuana.

Extensive police surveillance showed that James Emory was a frequent visitor to the two storage facilities. A critical piece of evidence linking him to the storage lockers, however, was a set of keys belonging to him. His keys opened all of the Master Locks at both storage facilities.

The set of keys was obtained as the Anne Arundel County police executed yet another of the search and seizure warrants on October 29. That warrant was for the home of James Emory at 1208 Villa Isle Court in Pasadena. In the garage attached to the house was James Emory's Ford Explorer. The search warrant for the property embraced the attached garage. The warrant, moreover, specifically listed the Explorer as part of the premises to be searched.

The police searched the Explorer. They found a small amount of marijuana in the left rear compartment of the vehicle. From the glove compartment, they seized a set of keys. The keys had the name "Master" on them. Sergeant Thomas Rzepkowski, who observed the keys, had, less than two hours earlier, executed the search warrant at the Sentry Self–Storage Facility. He remembered that the locks on both the locker and the boxes contained in the locker had been Master brand locks. When he saw the keys, he immediately concluded that they were the keys to the lockers at the storage facilities and boxes contained in those lockers. Detective Mike Chandler took the set of keys to both storage facilities and found that there was a key in the set for each and every one of the pertinent locks.

The appellant James Emory does not on this appeal contest the constitutionality of the seizure of that set of keys. Indeed, its reasonableness is clear under the Plain View Doctrine. *Coolidge v. New Hampshire*, 403 U.S. 443, 581–587, 91 S.Ct. 2022, 2080–2084, 29 L.Ed.2d 564 (1971). The entries into the garage, then into the Explorer, and then into the glove compartment were all valid intrusions under the authority of the search warrant. While searching the glove compartment for the items particularized by the warrant, Sergeant Rzepkowski spotted the keys in plain view. Based on his knowledge of the locks at one of the storage facilities, he had probable cause to believe that the keys might be evidence linking their owner to the storage of the marijuana. With respect to the seizure of the keys, therefore, there is no problem.

The bizarre little twist in this case is that although Sergeant Rzepkowski spotted the set of keys in the glove compartment and properly seized them, he failed to spot a second set of keys sitting on the console in the front seat in even plainer view. The Explorer itself was seized by the police and driven to police headquarters in anticipation of subsequent forfeiture proceedings. Betty Blackistone was an employee of the State's Attorney's Office who processed vehicles seized in anticipation of drug-related forfeitures. As she herself drove

the Explorer onto a vehicle storage lot at police headquarters, she observed this second set of keys sitting on the console. Her entry into the Explorer and her spotting of the keys in plain view was within a matter of hours of the initial search by Sergeant Rzepkowski. Ms. Blackistone reported her discovery to two of the detectives and ultimately she brought the keys to them. The appellant James Emory challenges the constitutionality of this seizure of the second set of keys.

## A. Harmless Error

■ But for the fact that we have undertaken to provide guidance for the trial court on remand, we would simply assume, for the sake of argument, that this seizure of the second set of keys was erroneous, as we would then hasten without pausing for breath to declare such error patently harmless. The second set of keys was but a duplicate of the first. The second set was also taken by Detective Chandler to the storage facility, where there was a key from the second set to fit every lock, just as there had been from the first. We would not bother with a ritualistic incantation of the familiar harmless error formula from *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), for we would be prepared to proclaim harmless error even if such a doctrine had never before been recognized. What earthly difference could it make to any juror who has ever served from the Assize of Clarendon to the present day that James Emory possessed two sets of incriminating keys rather than one?

## B. Once More Into the Breach!

■ Because the issue may somehow arise on retrial, however, we will dignify it. Doctrinally, the seizure of the second set of keys was indistinguishable from that of the first. The only factual distinction is that instead of one officer alone going through all of the necessary stages for a Plain View Doctrine seizure, several state agents in combination went through those stages before the second seizure. Betty Blackistone had a right to be behind the wheel of the Explorer as she drove it onto the police storage lot. The intrusion, if it

could even be called that once the vehicle was in lawful police possession, was valid. Betty Blackistone then spotted the set of keys sitting on the console in plain view. She did not, however, immediately seize those keys. She communicated her observation to the detectives in the case. They, armed with the information from the searches at the storage facilities, thereby acquired the probable cause to believe that the second set of keys was also, even as the first set had been, evidence linking James Emory to the storage facilities. Betty Blackistone, then, at their direction, seized the keys as their agent. The probable cause does not, as the appellant James Emory suggests, have to arise immediately after the plain view spotting. When the case law uses the adverb "immediately," it is simply to communicate the notion that the police may not seize the spotted item first and then develop probable cause. The probable cause must simply arise before the ultimate Plain View Doctrine seizure, as it did in this case.

*JUDGMENTS REVERSED; COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.*